# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 22, 2012 Session

## WILLIAM GLENN ROGERS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 38939      John H. Gasaway, III, Judge**

---

**No. M2010-01987-CCA-R3-PD - Filed August 30, 2012**

---

The capital Petitioner, William Glenn Rogers, appeals as of right from the post-conviction court's order denying his initial and amended petitions for post-conviction relief challenging his merged first degree murder conviction[1] and death sentence for the killing of nine-year-old Jacqueline Beard, as well as his convictions for especially aggravated kidnapping, rape of a child, and two counts of criminal impersonation. The Petitioner received an effective sentence of forty-eight (48) years' imprisonment for his non-capital offenses. On appeal, the Petitioner claims that the post-conviction court erred in denying relief because defense counsel provided ineffective assistance in both the trial and appellate proceedings related to these convictions and sentences and because multiple other constitutional violations call into question the validity of these convictions and sentences. After a careful and laborious review of the record, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, and Kathleen Morris, Nashville, Tennessee, for the appellant, William Glenn Rogers.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; John Carney, District Attorney General; and Dent Morriss, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The jury convicted the Petitioner of one count of first degree premeditated murder and two counts of first degree felony murder. The trial court merged the felony murder convictions into the premeditated murder conviction.

# OPINION

## Factual and Procedural Background

*Trial*

The Petitioner's convictions and sentences arose from the disappearance and murder of nine-year-old Jacqueline ("Jackie") Beard. The State presented the following proof at the Petitioner's trial:

On July 3, 1996, the victim, fourteen-year-old Carl Webber, and twelve-year-old Jeremy Beard were playing outside the Beard children's home when the defendant approached them. The children had seen the defendant, who identified himself as Tommy Robertson, drive by them earlier while they were playing at a "mud hole" in Whitlow's Hollow near the Beard children's home. The defendant offered to take the children swimming and told them he had fireworks. He also told the children that he was an undercover police officer and that he was looking for someone named Scott Hall. The defendant appeared to be carrying a walkie-talkie, but it is unclear whether he ever communicated via the walkie-talkie. The defendant left and the victim went home to get her mother, Jeannie Meyer.

Jeannie Meyer returned to the "mud hole" with her daughter. Soon thereafter, the defendant arrived with fireworks. The defendant told Ms. Meyer that he was an undercover police officer named Thomas "Tommy" Robertson. He said he was a partner of Allen Norfleet from the North Precinct. He then commended Ms. Meyer on finding out who he was because there are "a lot of sickos in the world." He also advised Ms. Meyer that he knew her mother-in-law, who owned a local restaurant, and her brother-in-law. He inquired about taking the children swimming, and Ms. Meyer responded that they were not allowed to go anywhere with anyone. Ms. Meyer then took the children home, and the defendant left also. Thereafter, Ms. Meyer talked to the children about strangers. At trial, Ms. Meyer testified that she told the children that they should stay away from strangers, even if they thought they might know them, and that they should never go near a vehicle occupied by a stranger. She also told the children that people sometimes lie and are untruthful about their identity and that some people carry fake police badges.

The following day, July 4, 1996, the defendant, his wife, Juanita Rogers, and Mrs. Rogers's granddaughter went to Land Between the Lakes for

-2-

a picnic. While there, the defendant and Mrs. Rogers' granddaughter went for a walk. They walked a long distance down a dirt road near Dyer's Creek. Upon returning from the walk, the defendant told his wife that "you could bury a body back here and nobody would ever find it."

At approximately 5:30 a.m. on July 8, Mrs. Rogers left for work at the Busy Bee restaurant, which was next door to the Rogers' residence. Mrs. Rogers saw her husband that morning and again before lunch. Thereafter, she did not see him again until approximately 6:00 p.m. The defendant was driving his wife's white Chevrolet that day.

During the afternoon of July 8, 1996, at approximately 1:30 p.m., the defendant appeared at the Meyer residence. He advised Ms. Meyer that he had lost his keys on July 3 and asked that they "keep an eye out" for the keys. Ms. Meyer responded that neither she nor the children would be in the area where they had met earlier because she had a doctor's appointment in approximately thirty minutes. He then told her that if they found the keys, she should call Sergeant Brian Prentice with the county police and tell him they had found Tommy's keys. During the conversation, the victim and Jeremy came outside and stood on the porch where the adults were talking. After the conversation, Ms. Meyer and her children went inside their home, and, according to Meyer, the defendant walked down the hill in front of their home in the direction of a nearby abandoned trailer.

Once the family was inside the home, the children began to watch television. Soon thereafter, the victim began to ask her mother if she could go outside to pick blackberries to take to the doctor's office. Ms. Meyer refused at first, but after more requests, she told her daughter she could go outside after changing her clothes. The victim changed into a Minnie Mouse T-shirt with hot pink circles on the front, teal blue shorts, and a pair of new multi-colored leather woven sandals. Ms. Meyer told her daughter that they would be leaving in fifteen minutes for the doctor's appointment and instructed her not to go looking for the lost keys. Ms. Meyer believed her daughter left around 1:40 or 1:45 p.m. Ten to fifteen minutes later, Ms. Meyer went outside to get her to go to the doctor's appointment. She looked for her and called for her, but received no response. She and Jeremy drove to the area known as Whitlow's Hollow, where they had met the man they thought was Tommy Robertson the week before. During their drive, they called out the victim's name, but still received no response. They stopped and asked Joey Sauers, whose mother and stepfather owned the property known as Whitlow's Hollow,

if he had seen the victim. He had not, nor had he seen a white vehicle in the area that day. Sauers estimated that it was approximately 2:00 p.m. when he met Ms. Meyer looking for her daughter. Sauers's mother and stepfather, Paul and Jackie Whitlow, began to help Ms. Meyer search for the victim. Ms. Meyer returned home to leave a note for her husband that they were out looking for the victim. She then began knocking on the neighbors' doors to see if anyone had seen the victim or knew anyone named Thomas Robertson. One neighbor, Mike Smith, saw a white vehicle with a black front end driving in the direction of Whitlow's Hollow around noon or 1:00 p.m. on July 8. He saw the same vehicle pass by his house again around 2:00 p.m.

During her search, Ms. Meyer saw what she believed were a set of footprints up the side of a bank and down the road in front of the abandoned trailer. She also saw a set of footprints that she believed looked like her daughter's near the "mud hole." She returned home shortly after 3:00 p.m. Her husband was home at the time. She told him that the victim was missing and that the man who had identified himself as Tommy Robertson had been at their house earlier. Mr. Meyer told his wife to call 9-1-1, and he went searching for the victim. The 9-1-1 call was made at 3:26 p.m. Law enforcement officers soon arrived, along with a K-9 unit, to search for the victim.

At some point after 6:00 p.m., the defendant arrived home in muddy pants. He told his wife he had been in a tobacco field on Dover Road. According to Mrs. Rogers, the defendant's pants were muddy at the knees and looked like they had been wiped off. Although his pants were muddy, Mrs. Rogers noticed that his shoes were clean. She also noticed that there was a spot of blood on his shirt. When Mrs. Rogers questioned her husband about the blood, he responded that he must have cut his finger. Mrs. Rogers had been waiting for her husband to come home because she needed her car to take her granddaughter to school. When she got in her car, she noticed small fingerprints on the passenger side windshield. Mrs. Rogers asked her husband if a small child had been in her car, which he denied. Mrs. Rogers explained that the fingerprints or hand prints appeared to drag down the window. Mrs. Rogers also noticed that although she had given her husband money to put gasoline in the car earlier that day, there was little gasoline in the car.

During the evening of July 8, Jeannie Meyer was interrogated by law enforcement about the disappearance of her daughter. At approximately 9:00 p.m., she went to the police station and gave a description of the man who had

identified himself as Tommy Robertson. Ms. Meyer acknowledged at trial that she was initially a suspect in the disappearance of her daughter, which she believed was not unusual in the disappearance of children. She admitted that the police report showed that her daughter disappeared around 1:00 p.m., but she said the report was simply wrong. Ms. Meyer also admitted that the police had questioned her about being involved in cocaine trafficking, and she suspected that her phone lines were tapped following her daughter's disappearance. Ms. Meyer was not satisfied with the investigation conducted by the Montgomery County law enforcement officials. The family conducted their own investigation into the victim's disappearance and brought in Billy Hale with the National Missing Child Locate Center.

On July 9, 1996, the day following the victim's disappearance, Mrs. Rogers accompanied her husband to the garbage dump. Mrs. Rogers thought it was unusual that her husband took only one bag of trash all the way to the dump. According to Mrs. Rogers, the defendant took the bag of trash out of his car and drove her white Chevrolet to the dump. En route, she noticed that her car had been cleaned from the day before, both inside and out, but the defendant denied cleaning the car. He stated that the car was washed off by the rain, to which Mrs. Rogers stated it could not have rained inside the car.

As a result of the official law enforcement investigation into the victim's disappearance, a composite drawing of the suspect in the victim's disappearance was printed in the newspaper. Sergeant Brian Prentice received three telephone calls advising that the defendant resembled the man in the composite drawing. One of the phone calls came from Jerry Wayman. He said that he had sold the defendant a cellular telephone prior to July 8 and that he and the defendant had discussed Wayman's purchase of a scanner. Based on the information from the telephone calls, Sergeant Cliff Smith attempted to locate the defendant.

Sergeant Smith first located Mrs. Rogers, who told him that the defendant was working at Midas Muffler. Sergeant Smith found the defendant at Midas Muffler and questioned him about his whereabouts the previous several days. The defendant told the officer that he had been to Paris Landing State Park on Saturday and Sunday July 6 and 7. He said he had been home all day Monday, July 8 with his wife. He denied that he had ever been to the area where the victim lived and disappeared. He later admitted that he had a friend, Allen Norfleet, who was a sergeant with the Clarksville Police Department who lived in the area and that he had visited him about a month

earlier. He denied possessing any fireworks. To corroborate his story of visiting the lake, the defendant showed the officer some floats and an air mattress in his trunk. Sergeant Smith returned to the Rogers's residence to discuss his investigation with Mrs. Rogers. At some point that morning, the defendant called his wife. She asked him what was going on, and he told her that two detectives had come to talk to him and wanted to search his car. She asked why they would want to do so, and he responded that he had no idea. During their conversation, she asked the defendant what he had told the officers about his whereabouts on Monday, July 8. He told her that he had been with her the entire afternoon. When she disagreed with him, he stated she must have her dates wrong.

Sergeant Smith returned to the defendant's place of employment for further questioning. After talking briefly with the defendant, Sergeant Smith asked the defendant to accompany him to the police station. Although the defendant was hesitant at first, he agreed. The defendant drove himself to the station where he was questioned by Sergeant Smith, Steven Hooker, a special agent with the F.B.I., Bret Murray, a special agent with the F.B.I., Jeff Puckett, a special agent with the T.B.I., and Billy Batson, an investigator with the Montgomery County Sheriff's Office. Sergeant Smith presented the defendant with three forms: a waiver of rights form (Miranda[2] form); a consent to search the defendant's residence; and a consent to search the defendant's vehicle. Smith read the defendant his Miranda rights, and the defendant signed all three forms at 11:18 a.m. on July 11, 1996.

Initially during the interview, the defendant admitted he had been in the area where the victim lived on the day of her disappearance, but he denied being involved in the disappearance. The defendant explained that he shot fireworks with three boys on July 3 in the Cumberland Heights area where the victim lived. He stated that he lost a key to his shed during that time and that he returned on July 8 to search for it. He admitted speaking with Jeannie Meyer and telling her to notify Allen Norfleet if she found the key. He denied that the victim was present during that conversation. The defendant said he left the Meyer residence and walked to an abandoned trailer because he had to use the bathroom. He said he defecated on a curtain inside the trailer and threw the curtain out the window. He said he drove to a waste management plant to inquire about employment but discovered that the help wanted sign had been taken from the window. He said he went home and called his wife

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

to tell her that the help wanted sign was gone. He stated he was at home from approximately 3:30 to 4:00 p.m., when he left to drive around looking for work. He said he returned home again around 5:45 p.m.

The defendant accompanied officers to his residence for a search of the home. While there, the defendant agreed to submit to a polygraph test. Following the test, the defendant changed his story. He admitted that the victim had been present when he spoke with Ms. Meyer on July 8. He stated that after he left the trailer, he entered his car and smoked a cigarette. He said he began to back up and leave when he felt a thud. He thought he had hit a tree, but when he got out of his car, he saw the victim underneath the car. He stated he did not know what to do. She had blood coming from her nose and was having difficulty breathing. He found one of his old shirts in the trunk and used it to cover her head. He placed her in the passenger side of his car. The defendant stated he drove to the bridge on Zinc Plant Road, saw there was no traffic, stopped his car, and threw the victim's body into the river. He said that the victim was wearing multicolored sandals and that one of them had come off her foot. He grabbed the shoe and threw it also. He told the officers that he had not seen her until he ran over her. He stated that he did not touch her "in any way sexually or abusive." The defendant reduced this story to writing and signed the statement. He also signed a picture of the victim to verify that the picture portrayed the person he struck. The defendant consented to a body search and was taken to the hospital where hair and blood samples were taken. The defendant was placed under arrest, following which the defendant asked if he would be charged with vehicular homicide. The defendant called his wife, telling her he had confessed to vehicular homicide and would be home in a couple of hours.

The following day, July 12, 1996, the defendant was questioned by Agent Murray, who readvised him of his Miranda rights before the interview. The defendant confirmed his statements of the previous day and gave a second written statement in which he admitted that the victim had been in the passenger seat of his vehicle on July 8. He stated that they talked for about five minutes. He said she got out of his car because she said her mother had to go to the doctor. The defendant told Agent Murray that after the victim got out of his car, he ran over her.

Also on July 12, the defendant went with the investigators to the area where he said he had run over the victim. The defendant also showed investigators where he claimed to have thrown the victim's body into the river.

The defendant reenacted the events of July 8 at the site visit. The defendant's court-appointed attorney was present during the site visit.

In addition to the defendant being considered a suspect, the Meyers were also initially considered suspects but were ruled out early in the investigation. Quinton Donaldson, a friend of the defendant, was also a suspect. Donaldson drove a white Camaro and was in the Cumberland Heights area on the day of the victim's disappearance. In fact, an officer spotted the Camaro parked at a residence a couple of miles away from the Meyer's residence and stopped and questioned Donaldson during the initial search for the victim on July 8. Later, Donaldson gave a written statement to Agent Puckett in which he stated that he was the person who threw the victim's body into the river, but he ultimately recanted that statement, denying having any involvement in the victim's disappearance.

During the search of the defendant's white Chevrolet Celebrity, authorities found a hand-held telescope, a cellular telephone power cord, and a cigarette lighter cellular telephone charger. Later, when the vehicle was processed, they found Doral-brand cigarette butts in the ashtray and an empty Doral wrapper stuck over the visor. They also found a Motorola cellular telephone, a can of glass cleaner, and a Tennessee map open to the Middle Tennessee region, including the Land Between the Lakes area. A floor mat was on the driver's side of the vehicle but not on the passenger's side. The vehicle was also searched for trace evidence, including glass, hair fibers, shoe tracks, and tire tracks. No fingerprints were found in the white Chevrolet that matched either the defendant or the victim. The defendant's 1984 blue Oldsmobile was also vacuumed for fibers. The authorities also searched the defendant's residence where a scanner radio was found. Carpet fibers were taken from the residence.

In addition to giving a statement to law enforcement officials, the defendant spoke to several other people about his role in the victim's disappearance. On July 14, 1996, the defendant's mother, Cynthia Schexnayder, and his half-brother, Martin Schexnayder, traveled to Tennessee to meet with the defendant in jail. The defendant recounted the same story to his mother that he had given the police in his written statement. He told her not to worry because "all they could get him for was vehicular homicide." He told his half-brother that he had cut grass near a park and was leaving when he backed over a little girl.

-8-

David Ross testified that as a reporter for the <u>Clarksville Leaf Chronicle</u>, he covered the victim's disappearance and talked with investigators and the victim's family. He said that in August 1996, he talked with the defendant by telephone. The defendant told Mr. Ross that he told the police that he had run over the victim in order for them to let him go home. The defendant admitted to Mr. Ross that the victim had been in his car, but he said he last saw her walking down the hill toward the woods. He denied knowing where the victim's body was but "figured" it would be in the water somewhere. He also said that he did not believe that the police were really looking for her.

The defendant sent a letter addressed to Wilbur Meyer, Jeannie Meyer's husband, from jail. The letter read as follows:

> Wilbur, don't ask me why I am writing this letter because you are just as hard-headed as T.B.I, F.B.I, and Montgomery County police. I apologize for saying I did something I didn't. I saw them on T.V. accusing you and your wife of selling her for drugs. That really pissed me and my wife off. I just had a feeling that if she died, she would be in the river because of dreams that I had and the configuration of the land. That's why I got on T.V. as soon as I did.
>
> I am going to close this letter now, but if you will do a one-hundred and eighty degree turn, you might find her. You are wasting too much energy trying to blame me. I didn't hurt her in any way. I told the police over and over that that's the last time I saw her was in my rear view mirror by the mud hole. When you do find her, you will see or she will tell you that I had nothing to do with this. Sincerely, Glenn. P.S. Help me and I will help you. See if you can get my wife to talk to me . . . Call her and if she will talk to me, I will help you in any way that I can.

He also placed several collect calls to the Meyer residence. The Meyers testified that they spoke with the defendant, hoping to find the victim. The defendant also left several messages for his wife in which he stated that if she would talk to him, he would tell her what happened, tell her the truth. He also left messages that he would tell her where the victim could be found.

On November 8, 1996, Jerry Lee Brown and his son were scouting for deer in the Land Between the Lakes area when they found a human skull. They reported their finding to Leeman Lyons, an employee of the Forestry Open Land and Wildlife. Mr. Lyons immediately called for a patrol car to go to the area where the skull had been found, and he also went to the area with the Browns and TVA police officer Joe Bridges. The witnesses described the area where the skull was located as a densely wooded area approximately one-half mile from a logging road. Detective Billy Batson testified that the area in question was several hundred yards from the Cumberland River and was approximately 48.5 miles from the area where the victim disappeared.

TVA Investigator Greg Mathis took photographs of the crime scene area and found a pair of teal-colored shorts on November 8. The crime scene was not processed, however, until the following day. During the search of the area, two sandals, a Minnie Mouse T-shirt that was turned inside out, additional bones, two cigarette butts, an earring backing, a plastic tobacco container, black plastic tape, and a hair mass were found. The tobacco container, the Doral-brand cigarette butt, and the black tape were not found in the immediate area of the remains. One cigarette butt was found near the skull, but it was unmarked and was older and more deteriorated than the Doral-brand butt. The Doral-brand cigarette butt was found approximately one hundred to three hundred yards from the crime scene and was in better condition, even having ashes on it.

Forensic anthropologist Dr. Murray K. Marks headed the testing of the skeletal remains. Dr. Marks arrived at the scene and discovered the remains "sandwiched between two layers of leaves," the bottom layer from the year before and the top layer from the fall of 1996. The remains were scattered around the scene, which is common where a person dies in the woods and remains for a long period of time. Dr. Marks examined the skull and found that the victim was between 7.4 and 8.7 years of age. The victim had both baby and permanent teeth. The victim was a Caucasian, but he could not determine the victim's gender. Dr. Marks concluded that the remains had been in the area between three and nine months. He examined the victim's dental records from 1993, but could not make a positive identification from the records. At trial, Dr. Marks explained that the records were from 1993, and children change dramatically in three years. However, he could not rule out the possibility that the remains were those of the victim. Jeannie Meyer identified the shoes, T-shirt, and shorts found at the scene as her daughter's clothing.

TBI forensic scientists examined the articles of clothing found at the site, but fibers from the clothing could not be matched to fibers taken from the defendant's vehicle. TBI officials did, however, find the presence of semen inside the crotch area of the shorts recovered from the site. Mark Squibb, a serologist formerly with the TBI, testified at trial that he found fibers that he believed were hair inside the shorts. A DNA profile could not be obtained from the semen stains. Furthermore, DNA testing on the cigarette butt found near the remains was inconclusive. A DNA profile was obtained from the Doral-brand butt, and the defendant was excluded as a possible donor for that butt.

Forensic serologist Meghan Clement tested teeth recovered from the scene. Ms. Clement compared the DNA sequence derived from the teeth with a blood standard submitted by Jeannie Meyer. Clement determined that there was a maternal relationship between Ms. Meyer and the donor of the teeth. Dr. Robert Lee, the Stewart County Medical Examiner, issued a death certificate for the victim. He concluded that the cause of her death was unknown.

FBI scientist Max Michael Houck tested fiber samples vacuumed from the defendant's car and the defendant's carpet at his residence and compared them with fibers taken from the victim's shorts. He identified light yellow carpet fibers in the samples taken from the defendant's car and residence that "exhibited the same microscopic characteristics and optical properties" as fibers taken from the victim's shorts. Although he could not identify the source of the fibers, the fibers appeared to have the same properties and characteristics as samples taken from the living room carpet in the defendant's residence. Agent Houck testified that either the victim's shorts had been in the defendant's living room, or the fibers had been transferred to the shorts through contact. He explained that the fibers could have been transferred to the defendant's car via the defendant's shoes or clothing and then transferred to the victim's shorts if she came into contact with the defendant's car. Additionally, FBI chemist Ronald Menold tested the fibers forwarded to him by Agent Houck. He found the fibers from the victim's shorts and the vacuumings of the defendant's car and residence to be consistent in polymeric composition.

State v. William Glenn Rogers, No. M2002-01798-CCA-R3-DD, 2004 WL 1462649, at *2-9 (Tenn. Crim. App. June 30, 2004), aff'd State v. Rogers, 188 S.W.3d 593 (Tenn. 2006).

-11-

The Petitioner offered the following proof at trial in support of an alibi defense:

Edra Landon testified that while she was working at Shelby's Riverside 66 service station on July 8, 1996, a man dressed in a work uniform and driving a blue four-door truck entered the station to apply for a job between 4:00 and 4:15 p.m. She said it was a Monday. She saw the composite drawing of the suspect in the victim's disappearance and called the police to advise that he had been in the service station on July 8. She admitted on cross-examination that she could not be one hundred percent sure that the defendant was the man who came into the store that day. She testified that only one person responded to their ad for employment. Robert Landon confirmed his wife's account. He testified that the man who visited the service station was wearing blue pants and a mechanics shirt. He talked to the man for approximately twenty minutes. He felt pretty sure that the man who came in looking for work was the defendant. Once he realized that the defendant had been in the store, he called Wilbur Meyer, the victim's stepfather, who was a friend of his. Ms. Landon's father, Eddie Kingins, also testified that he was at the store between 3:30 and 4:00 p.m. on July 8, 1996, and saw the defendant in the store. He also testified that the defendant was driving a blue four-door pickup truck. When he saw the defendant on the news two or three days later, he called his daughter.

Rogers, 2004 WL 1462649, at * 9. As part of his defense case, the Petitioner also "tried to point out discrepancies and contradictions in the State's evidence." Rogers, 188 S.W.3d at 601.

The State presented rebuttal testimony from Investigator Billy Batson who "testified that the defendant had stated that he had worn blue jeans and a maroon and green tank top and tennis shoes on July 8, 1996." Rogers, 2004 WL 1462649, at *9. Batson also testified that "[t]he defendant had never suggested to [him] that he stopped at the service station to inquire about employment" and that "there was no evidence that the defendant ever owned or used a blue pickup truck." Id.

Based upon the evidence presented at trial, the jury convicted the Petitioner of first degree premeditated murder, first degree felony murder in the perpetration of a kidnapping, first degree felony murder in the perpetration of a rape, especially aggravated kidnapping, rape of a child, and two counts of criminal impersonation. Id. at *10. The trial court merged the two felony murder convictions into the premeditated murder conviction and entered a single judgment order of first degree murder. The trial court entered only one judgment of conviction for criminal impersonation, apparently because the two convictions were based on alternative counts.

-12-

During the sentencing phase of the Petitioner's trial, the State presented evidence establishing that the Petitioner had been convicted, pursuant to guilty pleas entered on April 12, 1991, of two counts of aggravated assault in Gwinnett County, Georgia, and that the statutory elements of these prior offenses involved the use of violence to a person. See id.; see also Rogers, 188 S.W.3d at 601. The State also presented the following victim impact testimony from the victim's mother:

Jeannie Meyer testified that she lost her job as a result of her daughter's disappearance and murder and has remained unemployed since that time. Additionally, her husband had taken off from work to assist in the search for her daughter. She testified that her two sons, Joshua and Jeremy, had experienced severe psychological trauma as a result of their sister's death. Jeremy had been diagnosed with post-traumatic stress disorder, depression, and anxiety. He had also been confined to several mental hospitals, boys' homes, and juvenile homes. Joshua, the oldest son, was very angry over his sister's death.

Ms. Meyer explained that she could not sleep for a long time following her daughter's disappearance and felt powerless to protect her children. In addition to suffering from nightmares following her daughter's disappearance, she also felt very guilty and regretted letting her go outside. She testified that her daughter was a friendly, happy, and well-liked child. Additionally, she was also very talented. She could play the guitar, organ, and drums and sang a solo in church every year.

Rogers, 2004 WL 1462649, at *10; see also Rogers, 188 S.W.3d at 601.

The Petitioner's mitigation proof at sentencing consisted of the following:

The defense called Mildred Denise Rogers to testify. Ms. Rogers is the defendant's sister. She testified that she was now known as Samuale "Sam" Roger, but her legal name remained Mildred Denise Rogers. She explained that she and her brother grew up in Louisiana and that she was two years old when her parents divorced. Her mother remarried Danny Schexnayder. Ms. Rogers was not fond of her stepfather, but the defendant was always nice to him. The defendant tried to gain the attention of Schexnayder, but he ignored the defendant. During the marriage, Schexnayder became demanding, and their mother was only affectionate to them when Schexnayder was not around.

The Schexnayders had two children together, Danny, Jr. and Martin. The defendant was not allowed to play with Danny, Jr. It was following Danny, Jr.'s birth that Schexnayder became "physical" with the Rogers children. Ms. Rogers witnessed Schexnayder pick up the defendant, spank him, and drop him to the floor. At this time, the defendant was five or six years old, and he started to withdraw. Schexnayder would also hit the defendant in the face. Although Ms. Rogers would yell at Schexnayder for hitting the defendant, their mother never intervened.

When the defendant was nine or ten, he ran away from home. Thereafter, his mother and stepfather would chain him to his bed. On one occasion, the defendant was chained to his bed for a couple of days. When the defendant would wet the bed, Schexnayder would take the mattress out to the front yard and push the defendant's face into it. He would chide the defendant by telling him that they were going to let everyone know that he wet the bed. On one occasion, Schexnayder made a sign saying the defendant had wet the bed and made him wear it for all the neighbors to see. The defendant also began to defecate in his pants, and Schexnayder would rub the pants in the defendant's face. Mildred Rogers testified that Schexnayder began to hit the defendant with anything that was within reach. She recalled that the defendant would often sit on his bed, holding his knees, and rock back and forth. When the defendant was fifteen, Schexnayder beat him with a pole until the defendant was bloody.

Ms. Rogers testified that after the Schexnayders had children together, she no longer felt that she and the defendant were a part of the family. They were often deprived of food and told they could not eat because their father had not sent their child support check. She remembered that on one occasion their biological father tried to visit them, but when he arrived, their mother called the police, telling them that he had not paid his support payments. As a result, they did not get to see their father. Schexnayder threatened to kill them if they told their father anything. Ms. Rogers recalled that one Christmas their father sent her a drum set and the defendant a dirt bike. Shortly thereafter, Schexnayder broke the drum set and sold the defendant's dirt bike. The defendant soon began stealing motorcycles in the neighborhood.

Ms. Rogers testified that she was sexually abused by Schexnayder's brother, Kenneth. She did not know if the defendant was sexually abused also, but he would hide under the house when Kenneth visited. Although their

mother took them for counseling once, she became angry and left when the therapist suggested that she needed help.

Ms. Rogers began to steal and write bad checks once she left home. She had attempted suicide on several occasions and was confined to a mental hospital. She had been diagnosed with multiple personality disorder and was receiving treatment. She had also been diagnosed with bipolar disorder, manic-depressive disorder, and borderline personality disorder. She had not been in any legal trouble for ten or twelve years at the time of her testimony.

Ms. Rogers testified that the defendant had gone AWOL from the Navy in 1980. During that time, he had a serious automobile accident. He received head and eye injuries as a result of the accident. She acknowledged that although she had suffered an abusive upbringing, she had never murdered or raped a child.

Lazarus Rogers testified that he married the defendant's mother, Cynthia, when she was fifteen or sixteen and he was thirty-one or thirty-two. They divorced in 1961 before the defendant was born. After the divorce, Cynthia returned and told him she was pregnant with his child. They reconciled, and the defendant was born in March 1962. In September of that year, they remarried. Cynthia later told him that the defendant was not his son. In 1964, Cynthia left him again and took the children. In 1969, Cynthia asked him for a divorce. At the time, she was living with a man she called her husband and with whom she had two children. Although he had not paid child support, she had let him see the children until that time. Mr. Rogers testified that the defendant called him on occasion and told him that his mother was not good to him, but Mr. Rogers claimed not to know what was going on in the house.

Mr. Rogers testified that the defendant ran away to his house once. The defendant told him that his stepfather tried to beat him with a coat hanger. He said that the defendant was very withdrawn and that he attempted to get a psychological evaluation on the defendant when he was 14.

Mr. Rogers testified that the defendant's current wife was much older than the defendant and that she was very dominant. He testified that he was in the restaurant on July 8 when the defendant came in. He recalled that the defendant told his wife that he was going to a cabinet shop to look for work, and Mrs. Rogers became angry because she did not want him to go.

-15-

The defendant's aunt, Peggy Ruth Page, testified that she never saw her sister, Cynthia, show any affection toward the defendant or his sister. She acknowledged that she knew there was child abuse in the Schexnayder home. She further testified that on more than one occasion the defendant was chained to his bed. Although the defendant never told her so, she believed that he had been sexually abused.

The defendant's cousin, Deborah Lynn Miller, testified that she was six years older than the defendant. She confirmed that there was unequal treatment of the Rogers children and the Schexnayder children. She testified that the defendant's stepfather often yelled at him and called him names. Although she had never witnessed abuse, she was later told that the children were abused. She also testified that the defendant's mother told her that she did not love the defendant.

Two of Mildred Rogers's friends testified. They corroborated the earlier witnesses' testimony that the defendant and his sister were not given attention by the Schexnayders. One of the friends, Lynelle Meadows, testified that she believed that both the defendant and Mildred Rogers had been sexually abused by their uncle Kenny.

The defendant's elementary school principal, Victoria Meares, testified that the defendant was a discipline problem. She testified that the defendant would often bite other children and was called "Wolfie." She referred the defendant to a mental health clinic for counseling, but she did not know if he ever received counseling. She testified that the defendant was not able to interact with other children in an appropriate way and lacked social skills. Although the defendant's mother was nice, Ms. Meares did not believe that the parents gave her consistent, positive support in dealing with the defendant's problems. She never saw any signs of physical abuse, and the defendant never reported any abuse.

Thomas Neilson, Ph.D., a clinical psychologist, was retained by the defense to evaluate the defendant. Dr. Neilson spent twenty-four hours examining the defendant. He also interviewed the defendant's sister and her therapist and reviewed extensive records collected by the mitigation specialist. Dr. Neilson testified that the defendant's life had been very unstable. His parents divorced when he was very young, and he changed homes very often. He lived in nine different homes the first ten years of his life and attended ten schools, including five elementary schools. He did not have a chance to form

friendships. As a result of the foregoing, he experienced feelings of insecurity and abandonment.

Dr. Neilson testified that the defendant performed poorly in school and received bad grades for conduct. He was suspended several times for his conduct, including biting and hitting. Dr. Neilson surmised that although he received some group therapy and speech therapy, the defendant changed schools so often that the school system never had a real opportunity to respond to his problems.

Dr. Neilson testified that the defendant suffered physical, sexual, and emotional abuse. Both the defendant and his sister reported being beaten by their stepfather. Moreover, the defendant's mother did little to protect him from the abuse. Dr. Neilson testified that both the defendant and his sister feared for their lives, which had a significant effect over time. The defendant reported that his stepfather beat him about the head with a baseball bat, and the defendant's sister said that she had seen the stepfather hold the defendant against the wall and cut off his air until he passed out. Dr. Neilson stated that the police were called to the Schexnayder's home forty times between 1972 and 1979. According to Dr. Neilson, the police records indicated the Schexnayder home was a "very chaotic home environment."

Dr. Neilson testified that the defendant said he and his sister were treated much differently than their half-brothers. The defendant said that he was often punished for the acts of his half-brothers and that he and his sister went unfed on several occasions. The defendant stated that he was often chained to his bed and that he would howl out of frustration. As a result, he was given the nickname "Wolf." Dr. Neilson also said that the defendant began to steal motorcycles in the neighborhood after his stepfather sold the dirt bike that his father gave him.

Dr. Neilson testified that both the defendant and his sister reported being sexually abused by their uncle. The defendant also reported that he was sexually and physically abused by the staff at Louisiana Training Institute in the late 1970s. The defendant further claimed to have been sexually abused by a man who gave him a ride after he ran away from home. The defendant's sister also believed that the defendant was sexually abused by a babysitter and someone who lived in the neighborhood. As a result of these instances, the defendant suffered trauma. Dr. Neilson testified that trauma can have a long-term, permanent effect on the way the brain functions, which can cause mood

-17-

swings, irritability, and anger. Dr. Neilson also testified that children tend to imitate learned behavior, including violence and abuse of children.

As a result of a psychological evaluation, Dr. Neilson diagnosed the defendant with post-traumatic stress disorder, depressive disorder NOS ("not otherwise specified"), dissociative disorder NOS, and personality disorder NOS with antisocial and borderline features, also known as mixed personality disorder. Based on letters the defendant wrote to his father when he was young, Dr. Neilson believed the defendant dissociated. The defendant signed the letters "William Little" and stated in the letters that he had two personalities – "Billy" and "William." Although Dr. Neilson concluded that the defendant dissociates, he doubted that he had "full blown dissociative identity disorder." Dr. Neilson assigned the defendant a GAF, global assessment of functioning, of fifty, which is severely impaired.

On cross-examination, Dr. Neilson acknowledged that this case was his first criminal forensic case. He also admitted that in preparing his report, he relied upon a lot of information supplied by a capital mitigation specialist. Dr. Neilson did not personally interview the defendant's mother, stepfather, siblings or wife, but relied upon the mitigation specialist's interviews of those people.

Dr. Neilson acknowledged that the defendant had spent a total of eleven years in prison during his adult life, excluding his current incarceration. The defendant had been incarcerated in Florida, Mississippi, and Georgia. During his incarceration in Mississippi, a report noted that the defendant's separate personality, "Billy," was not "an integrated separate personality, but rather an imaginary companion who gets the blame for doing antisocial things." Dr. Neilson admitted that he had never seen the defendant switch personalities. The defendant advised him, however, that he had asked "Billy" if he knew anything about the crimes against the victim, and "Billy" denied any involvement. The defendant also told Dr. Neilson that he had not committed the crimes against the victim and that he had been pressured into giving a false confession. Although Dr. Neilson did not believe that the defendant's dissociative disorder was directly related to the crimes against the victim, he said it indicated the severity of the defendant's abuse and trauma.

Dr. Neilson testified that the defendant fell within the normal range of intellectual functioning, had no intercranial abnormalities, had logical and coherent thought processes, and expressed no delusional or paranoid ideas.

Dr. Neilson admitted that the defendant's MMPI test results suggested that the defendant exaggerated his symptoms possibly due to a cry for help or malingering. Dr. Neilson did not believe that the defendant malingered, and he found the MMPI test results to be invalid. Dr. Neilson admitted that part of the defendant's depression could have resulted from his incarceration and the charges pending against him. Dr. Neilson further admitted that Dr. Caruso . . . had not diagnosed the defendant with any of the Axis I disorders that he found.

The defense also called Dr. Cecile Guin, a school social worker employed by Louisiana State University, to testify as an expert in the field of social work and Louisiana's conditions of confinement. Dr. Guin prepared the response on behalf of the State of Louisiana to a federal investigation regarding the treatment of children in state institutions. While the defendant was at Louisiana Training Institute (LTI) in 1978, there was severe abuse of the inmates. In fact, eight guards were terminated and three guards were indicted for beating three juveniles. She testified that children were chained to their beds, hit with belt buckles, hung on clothes-lines, and "popped" in the ear. In addition to officer-inmate violence, there was also inmate-inmate violence.

Dr. Guin testified that the Louisiana juvenile facilities were essentially racially segregated in 1978 but that the defendant, a Caucasian, had been put into the facility housing African-Americans with the most serious offenses. The institution did not provide adequate counseling or treatment programs during the time the defendant was there. The defendant told Dr. Guin that he had watched other inmates be abused and that he was unable to sleep at night because of fear. He told Dr. Guin that people had attempted to abuse him sexually in the facility, but he denied ever being raped or sexually abused.

Dr. Guin admitted on cross-examination that the defendant was at LTI for only eleven days before the beating of the three inmates, which spurred the investigation into the facility. Following that time, the facility was watched very closely.

Dr. Keith Caruso, a forensic psychiatrist, testified . . . [3] [that he] interviewed the defendant, his sister, his father, his estranged wife, and his

---

[3] In its opinion disposing of the Petitioner's direct appeal, this Court erroneously identified Dr. Caruso as a State witness rather than a defense witness.

high school principal. He also reviewed the defendant's prison records, school records, medical records, mental health records, military records, police reports, and witness statements. Dr. Caruso diagnosed the defendant with anti-social personality disorder and borderline personality disorder. Dr. Caruso testified that people with borderline personality disorder are sensitive to abandonment with a tendency to feel empty. He testified that the defendant felt abandoned by his biological father and rejected when his sister left home. He said the defendant felt rejected when his first marriage ended and feared his marriage to Mrs. Rogers was in jeopardy. At the time of the crimes in this case, the defendant was in an abandonment crisis. Not only was the defendant fearful of his marriage ending, he was fearful that he was going to lose the renewed relationship he had built with his biological father. According to Dr. Caruso, Mrs. Rogers, the defendant's current wife, was a mother figure to him. At the time of the crimes, the defendant was symbolically being abandoned by both his mother and father again. Dr. Caruso theorized that the murder of the victim was a response to feeling so abandoned, which caused the defendant to act out in ways that had been modeled for him.

Dr. Caruso did not diagnose the defendant with post-traumatic stress disorder because he did not exhibit all of the symptoms. Also, Dr. Caruso did not believe that psychotic or dissociative symptoms played a role in the crimes committed in this case.

Dr. Mark Cunningham, a clinical and forensic psychologist, testified regarding a violence risk assessment he performed on the defendant. He testified that if the defendant were sentenced to life imprisonment, he would be a capital offender in the general prison population and would be a long term inmate. The defendant was thirty-seven years old, and his age would substantially reduce his risk level compared to other inmates. Further, the defendant did not have a history of assaultive behavior while in prison, but he did have a history of minor disciplinary problems. He also had a history of threatening to retaliate against other inmates who threatened him. Dr. Cunningham concluded that the defendant had an eight to seventeen percent chance of committing a violent act of a serious nature while in prison. He admitted on cross-examination that the defendant would be a "significant risk" if left in the community. He agreed that if the defendant were in prison until a very old age, he would not likely commit future violent crimes. Dr. Cunningham also admitted that the defendant had previously escaped from prison, which he considered as a factor against the defendant. However, Dr. Cunningham did not believe that the defendant's prior prison escape, his prior

criminal record, or his history of incarceration was a good predictor of violent conduct in prison.

Rogers, 2004 WL 1462649, at *10-15; see also Rogers, 188 S.W.3d at 601-03.

The State presented rebuttal testimony at sentencing from the Petitioner's current wife, Juanita Rogers, and his ex-wife, Lisa Sanders. Through the testimony of Juanita Rogers, the State introduced a letter that the Petitioner had written to her while incarcerated prior to trial in which he "told her that he would not plead guilty to something that he had not done and stated, 'If I do get time, they will either kill me trying to escape or I'll kill myself.'" Rogers, 188 S.W.3d at 603. Juanita Rogers and Sanders also both testified that the Petitioner never had mentioned to them that he had been physically or sexually abused as a child. Id. Finally, the State presented rebuttal testimony from its own mental health expert, Dr. William Bernet, "who diagnosed the defendant with dissociative disorder, pedophilia, malingering, and anti-social disorder." Rogers, 2004 WL 1462649, at *16; see also Rogers, 188 S.W.3d at 604. The substance of Dr. Bernet's testimony was as follows:

> Dr. Bernet testified that he believed the defendant was malingering his dissociative disorder in order to make it seem worse than it was. Dr. Bernet did not believe that the defendant was under extreme mental or emotional distress at the time of the crimes in this case, and he did not believe that a connection existed between the defendant's dissociative disorder and the crimes committed against the victim. Dr. Bernet also stated that no direct connection existed between the defendant's difficult childhood and the crimes against the victim. According to him, the two factors that played a role in the defendant committing the crimes against the victim were the defendant's anti-social personality disorder and pedophilia.

Rogers, 2004 WL 1462649, at *16.

Based upon the proof presented during the sentencing phase, the jury found that the following four aggravating circumstances had been proven by the State beyond a reasonable doubt: (1) that the murder was committed against a person less than twelve years of age and the defendant was eighteen years of age or older; (2) that the defendant previously had been convicted of one or more felonies, other than the present charge, whose statutory elements involved the use of violence to a person; (3) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (4) that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit,

-21-

any rape or kidnapping. Rogers, 188 S.W.3d at 604; see also Tenn. Code Ann. § 39-13-204(i)(1), (2), (6) and (7) (Supp. 1996). The jury also concluded that these statutory aggravating circumstances outweighed any mitigating circumstances presented by the defense beyond a reasonable doubt and sentenced the Petitioner to death for the murder of Jackie Beard. Rogers, 188 S.W.3d at 604; see also Tenn. Code Ann. § 39-13-204(g)(1)(B). On direct review, this Court affirmed the Petitioner's convictions and sentences, including his sentence of death, as did the supreme court upon automatic review. See Rogers, 2004 WL 1462649, at *1; Rogers, 188 S.W.3d at 598.

## Post-Conviction Proceedings

On November 2, 2006, the Petitioner filed a *pro se* petition for post-conviction relief challenging his convictions and sentences. Upon consideration of the *pro se* petition, the post-conviction court appointed the Office of the Post-Conviction Defender (OPCD) as counsel of record for the Petitioner but later removed the OPCD as counsel based upon a demonstrated, actual conflict of interest. After the post-conviction court appointed new counsel for the Petitioner, an amended petition was filed on March 21, 2008.

Following the filing of the State's answer to the petition and amended petition, counsel for the Petitioner filed a motion for DNA testing asking that the post-conviction court order new forensic DNA analysis of the four (4) swatches of fabric cut from the shorts found near the victim's remains to determine if DNA could now be obtained from the semen stains and compared to the Petitioner's DNA sequence. The post-conviction court granted this motion and ordered that "Y-STR" DNA testing, which was not available at the time of trial and which tests specifically for the presence of male DNA, be conducted on the clothing swatches to determine if the Petitioner's DNA sequence was present.

A second amended petition for post-conviction relief was filed on May 26, 2009, raising the claims as framed and argued by counsel in this appeal. After the State filed its answer to the second amended petition, the post-conviction court held an evidentiary hearing on March 30 and 31, 2010. On the second day of the hearing, counsel for the Petitioner introduced as an exhibit an order signed by the post-conviction court incorporating into the record of these post-conviction proceedings "the entire record on appeal" from the Petitioner's direct appeal proceedings in both this Court and the supreme court. During the hearing, the Petitioner presented testimony from the following witnesses: Assistant District Public Defender Charles Bloodworth, one of the attorneys who represented the Petitioner at the trial level; Jerome Converse, lead counsel for the Petitioner at trial; Dr. Pamela Auble, a forensic psychologist; and Meghan Clement, the forensic biologist with Laboratory Corporation of America ("Lab Corp.") who testified as an expert for the State at the Petitioner's trial and who later performed the Y-STR DNA testing ordered by the post-

-22-

conviction court. The State presented testimony from the following witnesses at the hearing: Assistant District Public Defender Collier Goodlett, an attorney who initially represented the Petitioner prior to trial; Ronald L. Lax, the owner of Inquisitor, Inc., the private investigation firm hired by Converse to investigate the Petitioner's case for the defense prior to trial; Billy Batson, the lead investigator for the Montgomery County Sheriff's Department on the Petitioner's case; and Mark Squibb, the forensic biologist who performed the initial serological analysis of the victim's shorts when he worked for the Tennessee Bureau of Investigation (TBI) crime lab prior to the Petitioner's trial.

Charles Bloodworth testified that he had been an Assistant District Public Defender for approximately twenty (20) years. He was appointed to represent the Petitioner in 1996, at around the time of the Petitioner's arraignment. Bloodworth had never tried a capital case prior to this appointment and was not yet "capital-qualified." Bloodworth testified that he represented the Petitioner "for about four or five months," a period which included the initial phases of discovery. He met with the Petitioner several times at the jail and discussed with the Petitioner the discovery provided by the State.

Bloodworth testified that he had some difficulty receiving discovery from the State in this case. He explained that "there was zero discovery furnished at arraignment, nothing but a copy of the indictment," and that "[i]t was at least thirty and probably more like forty-five to sixty days before [the defense] received the first piece of paper from the District Attorney's Office that could amount to discovery." Bloodworth testified about the problems he had with discovery during his representation of the Petitioner:

> We had a series of discovery conferences but most of those consisted of a meeting at the District Attorney's Office where then District Attorney, Lance Baker, would produce, for example, a cardboard box of photographs and in the presence of a court reporter, one-by-one present me a photograph and I would acknowledge receipt of it. It was not discovery in the sense of here is a cardboard box full of evidence, we intend to present. Here's witness statements and so on. It was a very slow drawn out, one-by-one, page-by-page, with the court reporter writing down what I was getting, [a] process of stalling and delay.

Bloodworth later learned that the Petitioner had been making telephone calls from the jail to the victim's family. The District Attorney's Office found out about the calls and "gave the family either a tape recorder or instructions on how to get a tape record" and "record [the Petitioner's] telephone calls to the family." Bloodworth testified that he later learned that the Petitioner also had made at least one telephone call from the jail to the local newspaper. Bloodworth stated that he believed the State "knew that eventually they were going to have

to disclose" to defense counsel the Petitioner's statements to the victim's family and the local newspaper and that, as soon as they did, defense counsel would "clamp down" on the Petitioner and "cut off his phone privileges." Bloodworth testified that he believed "there was a deliberate effort to delay letting [him] know that [the Petitioner] was making telephone calls to the victim's family and [that] those telephone calls were being recorded." Bloodworth stated that discovery by the State "was stalled out" to allow for the phone calls to continue as long as possible. He testified that describing the State's "stalling tactics" with regard to discovery as being "prosecutorial misconduct" would be appropriate given that they were dragging out discovery as long as possible in order to avoid informing defense counsel about the Petitioner's uncounseled and recorded telephone calls. Bloodworth testified that he told the Petitioner during one of their last meetings not to make any more telephone calls to the newspaper or the victim's family.

Bloodworth also testified on direct examination that, when it was apparent that discovery was not forthcoming, he filed a motion to dismiss the indictment. Bloodworth explained:

> One week I would go over and be given five pieces of paper. The next week I would go over and be given twenty photographs of cigarette butts. What is this for? Well, we'll get to it later and so eventually I got frustrated and just filed a motion to dismiss the indictment for failure to comply with discovery and other things.

However, Bloodworth testified that the State's failure to provide discovery was only part of the motivation behind the motion, the other being "a lack of speedy trial." In the motion, filed on June 17, 1997, and a copy of which was introduced into evidence at the post-conviction hearing, Bloodworth alleged under oath that the Petitioner had been arrested on July 12, 1996, that he had entered a plea of not guilty and demanded a speedy trial at his arraignment on October 15, 1996, and that the State had since that time failed to comply with defense counsel's demands for discovery. Bloodworth recalled that, at the hearing on the motion, the trial court treated it as a motion to dismiss the indictment based upon a speedy trial violation. In the order denying the motion, a copy of which also was introduced into evidence at the post-conviction hearing, the trial court focused exclusively upon the alleged speedy trial violation and determined that no such violation had occurred after analyzing the factors set forth in Barker v. Wingo, 407 U.S. 514 (1972), and adopted by the Tennessee Supreme Court in State v. Bishop, 493 S.W.2d 81 (Tenn. 1973). The order denying the motion to dismiss recites the following procedural history regarding the "broken series of hearings" held on the motion:

A hearing began on July 18, 1997 during which the parties moved to close the proceedings due to what was characterized as highly prejudicial material. No proof was presented during the closed session; however, defense counsel, Charles S. Bloodworth[,] and assistant attorney general Lance Baker made their respective arguments concerning the motions. Several media sources filed motions to open the proceedings. On July 26, 1997, the Court conducted a hearing on the closure motion and held that further proceedings must remain open to the media. Further proof and argument were offered on September 11, 1997.

When asked at the post-conviction hearing whether he intended the motion to be primarily about a speedy trial violation, Bloodworth responded:

Clearly, the speedy trial in – it was stalling on the part of the State because the body had not been found and I wanted to get to trial if I could, before the body had been found. I said we can't go to trial until we get discovery and check out what you have, what evidence of death, if any, is there? [The Petitioner] had made some inconsistent statements as to perhaps running over the child, in the car, backing up on the hilltop. We went out and looked at the scene and walked the area, so I was trying to bring the case to a conclusion within a – to trial by a jury within six months or seven months of his arrest. Hopefully, to be blunt about it, before the body was found and that did not happen.

On cross-examination, Bloodworth admitted that the Petitioner had given a statement early on in the investigation to the effect that he had run over the victim, that there had been blood coming out of her mouth and nose, and that while she was still breathing he threw her off a bridge into the Cumberland River. Bloodworth also admitted on cross-examination that the time between the Petitioner's arrest and the discovery of the victim's body was "what would normally be a short period of time in a homicide case" to prepare for trial.

Bloodworth testified that as soon as the victim's body was discovered, and it was apparent "the State was almost certainly going to file capital," the State became more forthcoming in the discovery process. At that point, the State no longer required a court reporter to be there to record the delivery to defense counsel of each document of discovery. Instead, the State gave Bloodworth "bundles of paper" that he would then sign for. On cross-examination, Bloodworth admitted that the discovery ultimately provided by the State comprised "three or four or five cardboard boxes, so-called Banker's boxes full of documents."

Bloodworth testified that his representation of the Petitioner ceased at the direction of the District Public Defender because continuing the representation would have hampered Bloodworth's ability to represent other clients for which the Public Defender was court-appointed counsel. Because the District Public Defender knew Jerry Converse to be an experienced attorney who had done capital cases, he pulled Bloodworth off the case and asked that Converse be appointed to represent the Petitioner. Converse was appointed and Bloodworth thereupon ceased working on the case and turned his file over to Converse.

Jerry Converse, a Robertson County attorney, was appointed to represent the Petitioner in "late 1996 or early 1997." At the time of the post-conviction hearing, Converse had been licensed to practice law for "[a] little over twenty years." He testified that, during the time he represented the Petitioner, he did a lot of criminal work and that as he has gotten older his practice has gradually focused more on civil litigation. Before being appointed to represent the Petitioner, Converse had handled "several murder trials," including at least one capital case that he could recall. However, he testified that he had never seen and was not familiar with the 1989 American Bar Association Guidelines for the Appointment and Performance in Death Penalty Cases at the time of the Petitioner's trial, a copy of which was introduced into evidence at the hearing. On cross-examination, Converse testified that he had "never, ever worked on a case as hard as [he] did on this one," and had not worked as hard on a case since.

Converse testified that he was co-counsel on the case for a time with Assistant District Public Defender Charles Bloodworth. Converse became lead counsel upon his appointment because Bloodworth was not qualified to be lead counsel. Some time later Bloodworth withdrew from the case and Larry Warner, a private attorney out of Crossville, was appointed as second-chair counsel.[4] Warner stayed on the case as co-counsel through the conclusion of the trial. According to Converse, his knowledge of the case probably exceeded Warner's simply by virtue of the length of time Converse had been on the case relative to Warner. Converse and Warner hired the investigative firm of Inquisitor, Inc., owned by Ronald Lax, to provide assistance in the investigation for both the guilt and penalty phases. They also utilized the assistance of David Keefe and Kelly Gleason, who now works for the OCPD, to "bounc[e] ideas off," and Converse testified that these individuals were a "big help" on the case. In fact, Converse recalled that these attorneys actually drafted a motion for Converse's signature that was filed in the Petitioner's case. However, Converse could not recall which motion.

Converse testified that there was no clear division of labor between him and Warner prior to trial, but that as trial approached they decided that each attorney would handle certain

_____

[4] Larry Warner is now a judge for the General Sessions Court for Cumberland County.

tasks and examine certain witnesses. Converse explained that their division of labor "was not kind of what was traditional at the time" in terms of one attorney handling the guilt phase and the other attorney handling the penalty phase. Instead, they "both worked on both phases."

A copy of the indictment charging the Petitioner with the crimes for which he ultimately was convicted in this case was introduced into evidence during Converse's testimony, as were copies of the certified fee claims from Converse and Warner submitted to the Administrative Office of the Courts (AOC) for their representation of the Petitioner. When shown copies of the certified fee claims, Converse admitted that the first date upon which he billed for any activity on the case was November 3, 1997. He also admitted that the first date denoted in the billing records for a meeting between him and the Petitioner was March 13, 1998, at the jail facility in Montgomery County. However, Converse testified that these records did not correspond to his recollection that he was involved in the case prior to November of 1997. Converse stated that he was "sure" that he met with the Petitioner before March of 1998 because it is his "custom to go see the client pretty quick after [he is] appointed." However, Converse admitted that he had no "independent recollection" of the date upon which he first met with the Petitioner. Converse stated that his practice at the time was to try to record accurately all time he spent on a case for billing purposes, but that sometimes he would forget to write time entries down for a particular case if he was away from the office when working on that case. Converse testified, though, that a meeting with the Petitioner would have been significant enough in terms of recording the time spent for it for him not to forget to bill for it. Converse testified that fairly early in the course of the representation, after he first met with the Petitioner at the Montgomery County Jail, he had him moved to the Robertson County Jail both to have easier access to the Petitioner and to keep the Petitioner away from the media in Montgomery County.

Converse testified that he knew that the discovery process in the case "started out rather adversarial" between the prosecution and Bloodworth. However, after Converse "came on board," he had "a good working relationship" with the State relative to the discovery process. He denied that the State withheld anything from the defense or acted in bad faith during discovery. In fact, "it was almost the opposite effect." Converse explained:

> It was very much open file . . . . I felt like they handed over everything. I think he was so afraid that he would leave something out, he would just give me everything, probably stuff I wasn't even entitled to.

Converse received "quite a few" photographs from the State, some of which were identified and introduced during his testimony at the post-conviction hearing. They consisted of photographs of the "mud hole" discussed in the testimony presented at trial as well as

photographs of both the exteriors and interiors of the white Chevrolet Celebrity vehicle belonging to the Petitioner and the inoperable blue Oldsmobile Omega belonging to the Petitioner. Converse explained that the Petitioner's white Celebrity was similar to a white car driven by Quinton Donaldson, the friend of the Petitioner's who was considered a suspect by law enforcement early in the investigation of the case.

Converse recalled that Assistant District Public Defender Collier Goodlett had been involved in the Petitioner's case as counsel around the time of the Petitioner's arrest. Goodlett had gone "out to a bridge over the Cumberland River out here with [the Petitioner] and the police . . . for the purpose of [the Petitioner] showing the police where he had claimed to have thrown the body of the victim off of the bridge." Converse's knowledge of this event came from documents produced by the State during discovery. When asked whether he ever talked to Goodlett about the bridge trip, Converse stated: "I'm sure I did way back then."

Converse was asked to identify the motion to suppress signed and filed by him in the Petitioner's case and a copy of said pleading was introduced into evidence at the hearing. However, he was asked no questions about the motion during his direct examination. On cross-examination, Converse stated that he did not believe the Petitioner's initial statement to law enforcement – to the effect that he ran over the victim and then threw her in the Cumberland River – was coerced. Converse also made clear on cross-examination that, during their pretrial work on the case, the defense had referred the Petitioner's initial statements to Dr. Richard Ofshe, a sociologist from California whose research focused largely on police interrogation techniques, to determine whether the Petitioner's statements might have been false and given solely for the purpose of garnering publicity. However, after reviewing the statements, Dr. Ofshe could not conclude that the Petitioner's statements were false.

Converse also was asked during his direct examination to identify the motion to prohibit the death qualification of prospective jurors signed and filed by him in the Petitioner's case, and a copy of that pleading was introduced into evidence at the hearing. However, Converse had no specific recollection of having drafted the motion and believed that its substance came out of a capital case motions bank available to him at the time. He further testified that there was no particular reason why he filed it other than because it was one of motions "that you are supposed to file in a capital case."

Converse recalled that "this case stayed in the news for quite some time," partly due to the State but also because the Petitioner himself kept it "in the media." Converse explained that he "had to get a gag order basically against my own client to keep him from talking to the press" because that was something he "could not tolerate." Converse also

testified that "the victim's family kept it in the press quite a bit as well" but stated that he probably would have done "the same thing in that situation." Converse also testified that during the same period of time the Petitioner's case was in the news, there were two or three other cases involving the disappearance of little girls that the media would mention all together when something happened in one of the cases.

Converse recalled that the Petitioner's trial occurred in January of 2000, and that it lasted approximately between two to two and a half weeks. The process of jury selection was that a pool of prospective jurors was created through individual voir dire and then group voir dire followed. The juror questionnaires utilized in the case were prepared as a group effort by the prosecution and defense attorneys. Converse recalled reviewing those questionnaires upon their completion; however, he could not recall taking any notes as he reviewed the questionnaires.

Converse testified that he was not involved in the individual voir dire process and that Warner primarily handled all jury selection issues with the assistance of a jury selection consultant hired by the defense. In fact, when presented during his testimony with what were identified as copies of the jury questionnaires completed by the twelve jurors who sat on the Petitioner's case, Converse stated that he had no independent recollection of the documents. He acknowledged that they appeared to be consistent with completed questionnaires in the Petitioner's case. Converse also admitted that his fee claims from the Petitioner's case included only two time entries associated with the jury questionnaires: for time spent making copies of the questionnaires and for distributing some late questionnaires.

Converse testified that he did "not sit[] in during individual voir dire" and was not involved in any of the challenges that occurred at that stage of the jury selection process. Converse stated that he likely spoke to Warner regarding the progress of individual voir dire at the time, but that he could not recall any of the specifics of their conversations. When asked for the defense strategy on selecting jurors, Converse replied:

> I don't remember having any specific input on the type of jurors overall that we were looking for. I think that that was something that I relied upon Mr. Warner and the jury selection expert to do. I don't recall that I was involved in that aspect of it personally.

Converse defended his deference to Warner by pointing out that Warner "had a pretty good pedigree so to speak as far as capital cases in East Tennessee and Middle Tennessee," that Warner "knew what he was doing," and that Warner "wasn't somebody right out of law school or something to that effect." Converse stated that he had never handled a capital voir dire in his career.

Converse conceded during his testimony that it might have raised "somewhat of a red flag" with him if he had known that some of the jurors seated in the case had indicated on their questionnaires that they automatically would impose a death sentence in a case involving the death of a child, particularly given that one of the aggravators noticed by the State in the Petitioner's case was that the murder was committed against a person less than twelve years of age by a defendant eighteen years of age or older. Converse further conceded that asking prospective jurors about their ability to consider a defendant's upbringing and mental health issues in determining the appropriate sentence would have been useful during jury selection given the mitigation proof pursued by the defense in this case. However, when asked if he had any conversations with Warner about what kind of jurors they were looking for with respect to the potential mitigation proof, Converse responded: "I don't recall any specific discussion, but I can't say they didn't occur. I don't recall. I think they would have occurred, but I don't recall specifically."

Converse also did not recall being involved in the group voir dire portion of jury selection until he reviewed the transcript in preparation for the post-conviction hearing. In fact, when presented during his testimony with what were identified as copies of the peremptory challenge sheets from the Petitioner's case, Converse stated that he could not confirm that the documents were the challenge sheets because he could not recall having seen the presented documents before. Converse identified the signature of Larry Warner on the challenge sheets purporting to come from the defense. Converse also testified that he knew that Warner had not exercised all of his available peremptory challenges. When asked whether that presented a problem for appellate purposes, Converse stated that Warner "may have been satisfied with the jury that he had at that point." Converse explained:

> I recall a conversation where he said he hadn't used them all, but he was satisfied with what he had as far as the jurors went and I remember saying something to the effect of well, if you are satisfied, just because you use some more challenges, doesn't mean that you are going to end up with a better jury. I mean, he could very well have gotten some people on there and run out of challenges and not been able to get them off, so I don't think we took the approach that we had to use all the challenges. I do recall us having a conversation about that, yes.

Converse admitted that the prosecution's theory in this case was that the victim was taken from her home in Montgomery County, that she was raped at some point, and that her remains were later found in Stewart County. When asked to describe the theory of defense at the guilt phase of the Petitioner's trial, Converse responded:

The theory at the guilt/innocence phase was to hopefully create enough doubt to keep Mr. Rogers from receiving the death penalty. In other words, I had a pretty good idea a guilty verdict was coming. We had a dead eight-year old child or nine-year old child and a fairly conservative area. We had all kinds of circumstantial evidence and we had a defendant [who] was not very – I thought would be very sympathetic to a jury. So I had an idea it was coming. My thought was during the guilt/innocence phase to perhaps create enough doubt that it would carry over to the sentencing phase, kind of lingering doubt type of defense.

. . . .

Just looking at it realistically in my mind – there were some bad facts in this case and numerous people that were involved in the case besides me, other attorneys and stuff that I would consult – all saw it the same way, that I mean – it was a case that would be very difficult to win on a guilty or not guilty type of thing and we would throw the rape out altogether on the abduction of the child from that particular area, obviously would be kidnapping and the fact that the child was deceased almost automatically was a felony murder. The circumstances of the case – were if he were found guilty, there were two or three aggravators that kicked in right away on the capital side, so I mean there – there was some pretty tough cards dealt to us on the guilt phase. I mean – we did the best that we could with him under the circumstances, but speaking just for myself and probably for Mr. Warner, we probably had a pretty good idea that we were going to be pretty hot and heavy into [the] sentencing phase afterwards.

Converse testified the defense team considered the possibility of the Petitioner's testifying at both phases of the trial but concluded that his testimony "would have been a disaster." However, Converse could not recall why they reached that conclusion.

Converse testified that he did not believe at the time, nor has he ever thought, that the State presented sufficient evidence establishing that the victim was raped. Converse admitted that the only proof presented by the State in support of the victim's having been raped was the evidence concerning "semen or sperm" having been found on the victim's shorts that were discovered in Stewart County. However, Converse stated that the State never established at trial "who emitted that fluid." Converse also conceded that the only possible proof of the rape occurring in Montgomery County was that the victim was wearing the shorts that were found near her body while she was still in Montgomery County. Converse testified that he is "certain" he considered filing a motion to sever the rape charge

from the remaining charges, but that he could not recall in his mind the specific strategy for not doing so. On cross-examination, he stated that the facts underlying all the charges in this case were "a series of events that started in one county and ended in another" and that his opinion was that venue "probably could have been in either" county.

Converse testified that members of the defense team drove the distance between where the victim was abducted near her home and the location where her remains were found and determined that it would have taken between forty-five minutes to an hour to make the trip by car. Converse explained that they did this because the time and location given by Edra Landon, a defense witness at trial, about when she saw the Petitioner at a gas station on the afternoon the victim disappeared was not consistent with the time it would have taken the Petitioner to abduct the victim and dump her body where it was later found. A memorandum prepared by an employee of Inquisitor, Inc. regarding Landon's statement to the defense investigator that she had seen the Petitioner at 4:00 p.m. at the Phillips 66 gas station on Riverside Drive on the afternoon of July 8, 1996, was identified by Converse and introduced into evidence at the hearing below. Converse stated that this memorandum was available to defense counsel prior to trial. When asked whether there was time for a rape of the victim to have occurred in Montgomery County based upon the timeline established by Landon's statement, Converse replied: "I guess it could have occurred in fifteen minutes."

Upon being shown a 1996 article in a French Canadian forensic science journal detailing the transfer of sperm on one article of clothing to other clothes washed together in a washing machine, Converse testified that, had he known about the article, "it probably would have been something we certainly would have considered using" because there were other males living in the household with the victim at the time of her death, including her older brother, Jeremy Beard. When asked whether he recalled doing "any independent research" leading up to the Petitioner's trial "on potential semen evidence" like that discussed in the Canadian article, Converse responded that he had, yet he admitted to not having found the particular 1996 article presented to him at the hearing. Converse testified that, once the DNA test results came back as inconclusive regarding the Petitioner's being linked to the sperm found in the victim's shorts, he "wasn't as concerned about [the sperm evidence] at that point." Converse also testified on cross-examination that he was not sure he "could have gotten a jury to swallow" the theory posited in the Canadian article regarding washing machine sperm transfer.

Converse testified that he recalled talking to Meghan Clement prior to trial regarding the forensic work she did on the case. However, he had no specific recollection of having talked to Mark Squibb prior to trial regarding his forensic work on the case. When presented during his testimony with what was identified as a copy of Squibb's "bench notes" regarding the forensic testing he performed on the case, Converse stated that he had no idea what the

notations "AP spray" or "p30" meant in the notes. Converse also recalled reviewing the reports from the FBI concerning that agency's forensic testing of soil samples taken from the Petitioner's car for comparison with soil samples taken from the area where the victim's body was found. Converse acknowledged that the results of the reports – i.e., that the soil samples did not match – certainly did not hurt the Petitioner's defense.

Converse also identified during his testimony various documents he had seen during his preparations for the Petitioner's trial, including: the written report prepared by Dr. Marks, the forensic anthropologist who testified at the Petitioner's trial; the TBI request for forensic examination of the Petitioner's 1987 white four-door Chevrolet Celebrity vehicle to determine whether blood, hair, fibers and fingerprints were present in the vehicle; the written report prepared by the TBI concerning the results of its microanalysis of hair and carpet fibers; the written TBI report prepared by Mark Squibb concerning the results of his serological testing; and the written TBI report concerning the results of a polygraph examination of Quinton Donaldson indicating that he had been deceptive when asked questions in the fall of 1996 about the victim's disappearance and death. However, Converse was asked no further questions during his direct examination about any of these documents.

On cross-examination, Converse recalled that the sperm heads found by Squibb during his analysis were located in the crotch area of the victim's shorts. Converse also testified on cross-examination that there was a lot of information and evidence in the case that "never even made it into the trial" because the prosecution agreed early on to "just admit what [was] necessary to get the job done and not bring in all of these other things that may or may not give the [d]efense a basis to appeal." For example, Converse explained that the defense hired an expert to look at the carpet fiber evidence. However, her analysis uncovered evidence not noticed by the State's experts "that would have been a shot to the head for us, . . . a killer shot." He explained:

> There was some question about the fibers from [the Petitioner's] living room floor carpet being consistent with some fibers found on the victim or the victim's clothing[.] And she said year – I remember her looking at that but something that was – nobody else took any further than here, but there were some stains on that particular fiber – grease or dirt or something on that same fiber that matched up.

Converse testified that, upon hearing this, he told the expert "thank you," "[d]on't write that down," and "have a nice day."

Converse testified that part of the defense theory at trial was that the source of the semen found in the victim's shorts was possibly the victim's older brother or Quinton

Donaldson, a friend of the Petitioner's who was considered a suspect by law enforcement early in the investigation. Converse stated that, in order to support the possibility that the victim's older brother was the source, the defense attempted to get before the jury some Department of Children's Services (DCS)/Department of Human Services (DHS) records in which there was a statement from Jeremy Beard "to the effect that his father – natural father, had taught him – something about taught him how to have sex with his sister or something to that effect." Converse testified that the statements were made "to some sort of case worker or something along that line." Converse admitted that the defense tried to get these records introduced into evidence at the Petitioner's trial, but that the trial court ruled that they were inadmissible. Converse also testified that the trial court's decision not to allow the records to be presented to the jury was raised as an issue in the Petitioner's direct appeal. However, Converse admitted that there was a problem with the appellate issue because the records had never been made part of an offer of proof at trial.

Post-conviction counsel then introduced under seal through Converse excerpts from the DCS/DHS record on Jeremy Beard that defense counsel attempted to have introduced during the Petitioner's trial. A review of these documents makes clear that they are from treatment Beard received in 1997, after the victim's death. These records contain statements from Jeannie Meyer, the victim's and Jeremy's mother, indicating that Jeremy Beard "was close to his sister," that Jeannie Meyer divorced the children's biological father after "the DHS investigated physical abuse reported by the children," and that Jeremy's medical file indicated that his biological father taught him "how to have sex with his sister and that his dad watched while he had sex with his sister (who died 8 months ago)." The records contain the following excerpts from a February 1997 psychological evaluation of Jeremy:

> Jeremy maintained that he experiences guilt related to his sister's death, "I didn't go over that day," "I didn't go with her" (he did not explain the actual events that led up to his sister's death, but he is apparently referring to him not being with her and being unable to prevent the murder). He said that if he had went with his sister, he could have possibly prevented her death, but when asked how he could have done that, he replied "I don't know." As one might expect, Jeremy is experiencing extensive difficulty trusting others and is particularly suspicious of others' motives.

> Information contained within Jeremy's medical file suggested that he has allegedly sexually acted-out with his sister and others. Jeremy was asked if he has ever sexually acted-out to which he responded (after a long pause), "I don't know." . . . When asked if he ever sexually acted-out with Jackie (sister), he said "No"; when asked if he can be trusted, he replied "Yeah."

Jeremy was asked if he has experienced sexual abuse to which he answered "No."

The records also contain the following excerpts from a psychological evaluation of Jeremy in March of 1997:

> According to Mrs. Meyer, Jeremy has disclosed to the family therapist, Vonda St. Amant, that Mr. Beard taught Jeremy "how to have sex with his little sister, Jackie." It has not been determined if any inappropriate activity occurred between Jeremy and Jackie, although it is suspected based on what Jeremy disclosed. Mrs. Meyer continued to say that on one other occasion, Jeremy told her his father physically and sexually abused him. Jeremy refuses to discuss this issue any further when it is brought into the open.

Converse testified that Dr. Keith Caruso, the defense psychiatrist who testified at sentencing, was one of the witnesses "handled" primarily by attorney Warner at trial. Converse had no "independent recollection of Dr. Caruso at all in the sentencing hearing." Converse also could not say what the defense team was "thinking at the time, one way or the other" regarding any particular reason why they chose Dr. Caruso to testify at sentencing. However, on cross-examination, after reviewing Dr. Caruso's written report, Converse testified that it was "certainly . . . very possible" that the defense put Dr. Caruso on the stand in order to get before the jury the following conclusions contained within his written report:

> [A]t the time of the alleged offenses, the defendant was in a state of extreme emotional disturbance brought on by his sensitivity to abandonment and his fears that the two most significant persons in his life were on the verge of rejecting him.

> Should the jury determine that the defendant is guilty, it appears that his crimes were committed in response to this extreme emotional disturbance. In this scenario, it is likely that the defendant acted in a manner that had previously been enacted on him: he victimized a child sexually and violently.

Converse also testified on cross-examination that Dr. William Bernet had "brought up pedophilia" as a possible motivating factor for the Petitioner's crimes, a conclusion ruled out by Dr. Caruso's statement in his report that "gratifying pedophilic desires with a child" failed to explain the Petitioner's behavior at the time of the crime. Converse also recalled on cross-examination that he remembered consulting with a neurologist to assist with the defense, but that he could not recall whether they actually retained the services of such an expert for purposes of the trial.

-35-

Converse also recalled that the defense utilized Dr. Cecile Guin, a social worker employed by Louisiana State University (LSU), who had researched the conditions of Louisiana's juvenile justice facilities at the time the Petitioner was housed in such a facility. Converse remembered that there had been "some limitation" on Dr. Guin's testimony in that "there was an objection on the State's part that there was no proof [the Petitioner] had actually been exposed to some of the specific acts that Dr. [Guin] was attempting to testify to." Converse testified that Dr. Guin was his responsibility primarily as a witness and that he had made the decision to use her as a witness. However, he could not recall whether he questioned her at trial.

Converse testified that he was co-counsel on the Petitioner's direct appeal with Brock Mehler, who handled most of the work on the case at that point. Converse testified that he prepared the initial motion for new trial, but Mehler primarily drafted the amended motion for new trial. Converse described his involvement in the Petitioner's direct appeal as follows:

> My involvement in the appeal was very – I mean, I was listed as co-counsel, but that was Mr. [Mehler's] specialty and I answered questions for him and you know, helped fill in some of the blanks, things of that nature, but primarily, he wrote the appeal and prepared for the appeal.

Dr. Pamela Auble, admitted as an expert in neuropsychology and clinical and general psychology, testified that, at post-conviction counsel's request, she evaluated statements the Petitioner gave to law enforcement in order to determine whether his statement had been coerced. She prepared a report, dated March 29, 2010, which was admitted into evidence. She explained that, in conjunction with performing her evaluation, she reviewed "all the records that were relevant to the statement that were available," interviewed the Petitioner, and administered some standardized testing to the Petitioner. She also reviewed some previous testing and evaluations that had been performed by others. Her eventual determination was that his statement to the police "was coerced and unreliable." As stated in her report,

> From the test results that were obtained on this evaluation and on the 1998 evaluation, [the Petitioner] wants other people to see him as a good person, tending to minimize his own personality flaws. He also tends to be compliant with the demands of people in authority . . . . In addition, [the Petitioner] suffers from chronic post-traumatic stress disorder from his horrific childhood. In his childhood, he was trained to admit to wrongdoing by his stepfather even though he had not committed the offenses because the punishments would be even more severe if he did not "confess" to the

-36-

wrongdoing. A recent study . . . reported that people who have been exposed to past traumatic experiences such as abuse or victimization are more likely to give false statements during interrogation.

Additional factors that led to her conclusion included the "Reid technique" of interrogation that was used on the Petitioner; his being told repeatedly by the polygraph administrator that he was lying; the ten-hour period during which the interrogation was conducted; that the Petitioner "did not receive food and he apparently did not go to the bathroom" during the ten-hour period; and the Petitioner's claim that law enforcement suggested to him "that he would be charged with vehicular homicide instead of first-degree murder if he just said that he ran over this child and did not mean to." As to the Reid interrogation technique, her report set forth the following:

> The purpose of police interrogation is to elicit statements from defendants that describe their role in the alleged offense. The Reid technique is the most commonly employed strategy to accomplish this goal . . . . The Reid technique can be reduced to three processes: 1. Isolation in an interrogation room; 2. Confrontation or maximization in which the suspect is accused of the crime, presented with evidence, and blocked from denial; 3. Minimization in which the crime is morally justified and sympathy is feigned.

Dr. Auble testified that the Reid technique risks unreliable and untrustworthy statements. She added that she had been available to conduct this evaluation during the time preceding the Petitioner's trial, but that she had not been contacted by the Petitioner's lawyers.

On cross-examination, Dr. Auble acknowledged that she was aware that the defense had contacted an expert prior to trial about the Petitioner's statements and that the expert had concluded that the Petitioner's statements were not a "false confession." She asserted, however, that "a false confession and a coerced confession are actually two different things" and that a coerced confession could be true but "makes you believe it is less trustworthy." She also testified on cross-examination that, in her opinion, the Petitioner "basically understood the Miranda warnings." He, however, has "trouble with compliance with authority . . . where he doesn't really understand his right to remain silent."

Meghan Clement testified that she worked for Lab Corp. as the technical director in the forensic identity testing department. She was tendered and accepted without objection as an expert in serology and DNA forensics. Clement testified that she was originally contacted by the State in this case in early 1998. She was provided with samples for testing, including stains from a pair of pants. She was provided with four pieces of fabric, designated on the submittal form as "three semen stains and a possible semen stain." DNA tests were

requested on the samples. Only one of the samples produced a small amount of DNA, which was not sufficient to compare to any known reference sample.

In December 1999, she received a request for mitochondrial DNA testing, a different type of test. She stated, "we often had very good luck in getting mitochondrial DNA sequences where we couldn't get nuclear DNA profiles." However, the new testing did not produce "any sequence information that could be compared to any known reference sample."

In 2008, she received a request to do additional testing on the Petitioner's behalf. This test was the Y chromosome test, and it was performed on the extract that had originally been obtained from the fabric samples. The remaining extract had been frozen and was available for further testing. The new testing resulted in a "zero quantitation." The cloth samples were subsequently returned to Lab Corp. They again tried to extract DNA and develop a Y chromosome profile but were unsuccessful.

In addition to trying to extract DNA from the cloth samples in 2009, Clement also performed a "presumptive test for acid phosphatase as well as a test for the presence of P30, which is an antigen found in seminal fluid and those revealed negative results." The laboratory also examined the cloth samples microscopically, but did not find spermatazoa present.

Clement also examined microscopically three slides that had been prepared by Mark Squibb in conjunction with trial preparation. Clement "determined that there were very few visible sperm heads that were identified on the slides."

When asked whether the presence of sperm necessarily implied the presence of semen, Clement explained that tests had been performed demonstrating that sperm heads could be transferred among items of clothing during a washing machine cycle. Accordingly, a finding of spermatazoa did not necessarily imply the presence of semen. Clement also explained that a positive acid phosphatase test did not necessarily indicate the presence of semen. Rather, a weak positive test could be caused by other factors.

The State called Collier Goodlett, who testified that he had been practicing law for approximately thirty years at the time of the hearing. He practiced with the Public Defender's office in the nineteenth judicial district and also worked there at the time of the victim's disappearance. He began representing the Petitioner "either at the Sessions level or perhaps . . . shortly thereafter." He accompanied the Petitioner to the scene where the Petitioner had claimed to have run over the victim and to the bridge from which the Petitioner initially claimed to have thrown the victim's body. Also present were Agent

Murray, Investigator Batson, the District Attorney, "and other officers." Goodlett testified about the visit:

> I don't recall any conversations that occurred out on the bridge. We ultimately did go down to the area where [the victim] lived. As you drive up to it, there was a trailer I think off to the left, that was where she lived. There was a sort of muddy pond and then there was an area back off to the left as you approach, where supposedly he had stopped or had been parked, I don't recall? It is not inconsistent with my practice that once a defendant begins to start talking in my view far too much, that I will subtly tell them they need to be quiet. But that's basically all I recall. I don't recall talking to any particular person out there, other than being with the officers, sort of following them around.

Goodlett explained that they visited the two scenes because the Petitioner "had wanted to go out there and basically demonstrate the events." The Petitioner's explanation to the State's agents was consistent with what the Petitioner had told Goodlett. Goodlett added that, at this point in his career, he would not have permitted his client to engage in that manner with the State.

On cross-examination, Goodlett acknowledged that the trip to the bridge occurred on the same day that the Petitioner appeared in general sessions court. He stated that he would not recommend that his client speak to police officers and that, in general, he wanted to review discovery and ascertain the basis for the State's case before making a recommendation to his client about further proceedings. He also reiterated that, in retrospect, "I would not have ever let [the Petitioner] get in that car and go with them." On redirect, he acknowledged that, regarding the scene visits, he did what the Petitioner wanted done.

The State also called Ronald R. Lax, who testified that he is a private investigator working for the company Inquisitor. He was employed by attorney Warner to work on the Petitioner's case prior to trial. In October 1999, he consulted with Dr. Richard Ofshe in California, a sociologist with expertise "in false confessions and in recovered memory." The consultation regarded the Petitioner's statement. Following the consultation, the defense team decided not to call Dr. Ofshe as a witness because his testimony would not have been helpful.

Lax worked with five other Inquisitor employees in the investigation for the Petitioner. The bill for the company's services was "about thirty-three thousand" dollars.

The State next called Billy Batson, an investigator with the Montgomery County Sheriff's Department, who testified that he was the lead investigator in the Petitioner's case.

-39-

He denied that the Petitioner's statements had been coerced and explained that the Petitioner had requested the polygraph. No one in law enforcement suggested to the Petitioner that he might have committed "just a vehicular homicide," and no one suggested to the Petitioner that he might have run over the victim accidentally. Rather, the Petitioner asked law enforcement if he was going to be charged with vehicular homicide after the polygraph.

On cross-examination, Investigator Batson explained that, when the Petitioner asked if he was going to be charged with vehicular homicide, the charges of first degree murder had already been decided upon. In response to the Petitioner's question, however, he was told that the charges would be explained to him at a later time.

The State's last witness was Mark Squibb, the laboratory supervisor for the trace and DNA sections of the Miami Valley Regional Crime Laboratory in Dayton, Ohio, and the DNA Technical Leader for the DNA section. Squibb testified that he was formerly a forensic DNA analyst at the Tennessee Bureau of Investigation ("TBI") laboratory in Nashville, Tennessee. While employed by the TBI, he performed the original laboratory work on the shorts found with the victim's remains. He performed an "AP spray" test to the crotch of the shorts and obtained a "weak positive" result. He explained that the result was a "weak" positive because of the longer period of time it took for the testing substance to reach the color purple. He took four cuttings from the area testing "weak positive." He examined extractions from the cuttings microscopically and found "rare sperm heads" on three of the samples. Based on the weak positive AP (acid phosphatase) test and the sperm heads in the crotch area of the shorts, he concluded that there was semen on the shorts.

Squibb acknowledged that there was also a lot of dirt, discoloration, and debris in the extractions. He also acknowledged that the AP spray test may result in a false positive and that vaginal fluid can also produce a positive result. He further acknowledged being aware of studies "which pertain to the persistence of sperm as well as semen in washing." Nevertheless, he testified that he stood by his trial testimony.

On cross-examination, Squibb acknowledged that "rare" sperm heads meant that "very few," or less than ten, heads were found in the area being microscopically examined. He also acknowledged that he ran a P30 test on the shorts, which tests for an antigen produced by the male prostate gland and which is present in semen. The P30 test result was negative for the antigen, meaning "either it wasn't there or it did not reach the level in which [the] test could detect it."

After the parties submitted annotated versions of the second amended petition and answer as well as post-hearing briefs, the post-conviction court entered a 194-page order on

-40-

August 26, 2010, denying the Petitioner's initial and amended petitions for post-conviction relief.

## Standard of Review

Relief under the Post-Conviction Procedure Act of 1995, Tenn. Code Ann. §§ 40-30-101 through -122 (2006), is only warranted when a petitioner establishes that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Id. § 40-30-103. To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Id. § 40-30-110(f). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

### I.  Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial. See U.S. Const. amend. VI; Tenn. Const. Art. I, § 9; see also State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Indeed, the Sixth Amendment right to counsel is so fundamental and essential to a fair trial that the Fourteenth Amendment renders it obligatory upon the States. Gideon v. Wainwright, 372 U.S. 335, 342-45 (1963).

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v.

Washington, 466 U.S. 668, 687 (1984); see also Baxter, 523 S.W.2d at 936. The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. See also, e.g., Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011).

A petitioner's claim that his or her attorneys provided constitutionally deficient assistance is governed by the following two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687; see also Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004) ("To determine whether appellate counsel was constitutionally effective, we use the two-prong test set forth in [Strickland] — the same test that is applied to claims of ineffective assistance of trial counsel asserted under the Sixth Amendment to the United Constitution."). Stated simply, a petitioner must prove both that counsel's performance was constitutionally deficient, and that the deficiency actually prejudiced the defense. See Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). A petitioner's "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief." Goad, 938 S.W.2d at 370. Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Strickland, 466 U.S. at 697.

To establish the first prong of deficient performance, the petitioner must demonstrate that counsel "'made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" Felts, 354 S.W.3d at 276 (quoting Strickland, 466 U.S. at 687). That is, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). See also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); King v. State, 989 S.W.2d 319, 330 (Tenn. 1999); Baxter, 523 S.W.2d at 936. In order to satisfy this prong of the test, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. Upon reviewing the identified acts or omissions, the reviewing court must

then "make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). "[T]hat is, *the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'*" Strickland, 466 U.S. at 689 (emphasis added); see also Felts, 354 S.W.3d at 277.

We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). Finally, we note that criminal defendants are "not entitled to perfect representation, only constitutionally adequate representation." Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Therefore, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665 n.38 (1984)). Notwithstanding, we recognize that "[o]ur duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Id. at 785.

The prejudice prong of the Strickland test requires the petitioner to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also King, 989 S.W.2d at 330. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In evaluating whether a petitioner has satisfied this prong of the test, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome. Pylant, 263 S.W.3d at 869. "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

*A. Jury Selection*

In his first issue on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that his trial lawyers (individually and collectively, "Trial Counsel") provided constitutionally ineffective assistance during the jury selection process. The Petitioner alleges numerous deficiencies on Trial Counsel's part during the jury selection process, which he summarizes in his brief to this Court as (1) failing to conduct an adequate voir dire; (2) failing to object to the trial court's voir dire process and juror excusals; (3) failing to meaningfully exercise peremptory challenges; (4) failing to utilize both defense lawyers during voir dire; and (5) failing "to object, preserve, raise, and appeal the voir dire issues stated herein." The post-conviction court determined that the Petitioner failed to carry his burden of proving that he suffered prejudice as a result of Trial Counsel's performance during jury selection. We agree with the post-conviction court's conclusion and hold that the Petitioner is entitled to no relief on the basis of Trial Counsel's performance during jury selection.

Jury selection implicates an accused's state and federal constitutional rights to a competent, fair-minded, and unbiased jury. See Smith v. State, 357 S.W.3d 322, 347 (Tenn. 2011) (recognizing that "[b]oth the United States and the Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury."); see also Irvin v. Dowd, 366 U.S. 717, 722 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."); Mahdi v. Bagley, 522 F.3d 631, 636 (6th Cir. 2008) ("The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state court."); State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (recognizing that, under the Tennessee Constitution, every accused is guaranteed "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation'") (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)). The process of voir dire is aimed at enabling a defense lawyer (as well as a prosecutor) to purge the jury of members not meeting these criteria. See United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976) ("[T]he principal way this right [to an impartial jury] is implemented is through the system of challenges exercised during the voir dire of prospective jurors."); Smith, 357 S.W.3d at 347 (recognizing that "'[t]he ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'") (quoting State v. Hugueley, 185 S.W.3d 356, 390 (appx) (Tenn. 2006); see also Tenn. Code Ann. § 22-3-101 (1994) ("Parties in civil and criminal cases or their attorneys shall have an absolute right to examine prospective jurors in such cases, notwithstanding any rule of procedure or practice of court to the contrary."); Tenn. R. Crim. P. 24(b)(1) ("The court may ask potential jurors appropriate questions regarding their qualifications to serve as jurors in the case. It shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges."). As emphasized by the United States Supreme Court,

The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side of the case. Clearly, the extremes must be eliminated – i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.

Morgan v. Illinois, 504 U.S. 719, 734 n.7 (1992) (quoting Smith v. Balkcom, 660 F.2d 573, 578 (5th Cir. 1981)).

As the United States Court of Appeals for the Sixth Circuit has asserted, "[a]mong the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense." Miller v. Francis, 269 F.3d 609, 615 (6th Cir. 2001). By posing appropriate questions to prospective jurors, a defense lawyer is able to exercise challenges in a manner that ensures the jury passes constitutional muster. See United States v. Blount, 479 F.2d 650, 651 (6th Cir. 1973).

Despite its significance, a trial lawyer is "accorded particular deference when conducting *voir dire*" and his or her "actions during *voir dire* are considered to be matters of trial strategy." Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001). Also, "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." Id. Thus, it is imperative for a petitioner claiming ineffective assistance of counsel during jury selection to demonstrate that the resulting jury was not impartial. See Smith, 357 S.W.3d at 348 (citing James A. Dellinger v. State, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug. 28, 2007)). We conclude that the Petitioner has failed to make such a demonstration in this case.

In Smith, the Tennessee Supreme Court recently dealt with a post-conviction claim of ineffective assistance of counsel during voir dire in another capital case. Smith, 357 S.W.3d at 346-49. The petitioner claimed that he was due a new trial because his lawyer did not ask the jurors during voir dire about their past experiences as a victim of crime or with a victim of crime. Id. at 346. One of the jurors who sat on the petitioner's trial testified at the post-conviction hearing that, shortly before the trial, his daughter's boyfriend had been murdered. Id. The juror also testified that "the impact of [the victim's] death on his own family had been great." Id. at 347.

First noting that the "'proper fields of inquiry [during voir dire] include the juror's occupation, habits, acquaintanceships, associations and other factors, including his [or her] experiences, which will indicate his [or her] freedom from bias,'" id. (quoting State v.

Onidas, 635 S.W.2d 516, 517 (Tenn. 1982)), the Smith court then emphasized that "potential bias arises if a juror has been involved in a crime or incident similar to the one at trial." Id. (citing Ricketts v. Carter, 918 S.W.2d 419, 422 (Tenn. 1996); Durham v. State, 188 S.W.2d 555, 558 (Tenn. 1945)). Accordingly, the court held, "questions to cull the jury for persons who might be biased due to their past experiences with the criminal justice system are a critical part of a competent voir dire in criminal cases," and "the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable." Id. at 347-48 (citing Hughes, 258 F.3d at 460). Clearly, then, it is possible for defense counsel to be deemed deficient in their performance during voir dire based on a failure to ask critical questions aimed at revealing bias against the defense, "absent a showing that counsel had a strategic reason for not asking the question." Id. at 347. We also note as significant, however, that the record in Smith reflected that, not only did the petitioner's lawyer fail to ask these critical questions, but neither did the trial court or the prosecution. Id. at 346.

However, even if a petitioner is successful at demonstrating deficient performance during voir dire, as was the petitioner in Smith, relief will not be granted unless the petitioner also demonstrates "that the deficiency resulted in having a juror seated who was actually biased." Smith, 357 S.W.3d at 348 (citing James A. Dellinger, 2007 WL 2428049, at *30); see also Goeders v. Hundley, 59 F.3d 73, 75 (8th Cir. 1995). Recently, considering a claim of ineffective assistance of counsel during jury selection, the United States Court of Appeals for the Sixth Circuit clarified that

[b]ias may be actual or implied. Actual bias is bias in fact – the existence of a state of mind that leads to an inference that the person will not act with impartiality. The doctrine of presumed or implied, as opposed to actual, bias provides that, in certain "extreme" or "exceptional" cases, courts should employ a conclusive presumption that a juror is biased. We may presume bias only where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances. Examples of such a relationship are that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.

Treesh v. Bagley, 612 F.3d 424, 437 (6th Cir. 2010) (internal quotation marks and citations omitted).

The Smith court denied the petitioner's claim for relief on the basis of trial counsel's deficient performance during jury selection because the petitioner had "introduced no evidence of actual bias or partiality." Smith, 357 S.W.3d at 348. Indeed, the subject juror in the Smith case testified at the post-conviction hearing that he "recalled telling the trial judge in response to questioning that there was no reason he could not give [the petitioner] a fair trial." Id. The Tennessee Supreme Court categorically rejected the petitioner's claim that bias should be presumed under the circumstances, holding that it had "never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias, and we decline to do so now." Id. Because the petitioner failed to adduce proof that his jury contained a biased juror, the court held that he was "not prejudiced by counsel's failure to ask the . . . prospective jurors whether they or anyone close to them had ever been the victim of a crime," and denied relief on this basis. Id. at 348-49.

In this case, the Petitioner adduced no testimony at the post-conviction hearing establishing juror bias. The Petitioner attempts to rely on responses to the jury questionnaire, particularly the response by some of his jurors that the death penalty "should be automatic for anyone who is convicted of murdering a child." The questionnaires were simply preliminary tools to foster appropriate voir dire, however, and were not designed as mechanisms to eliminate potential jurors solely on the basis of answers given without the benefit of legal instruction from a trial judge. See State v. Sexton, 368 S.W.3d 371, 392-95 (Tenn. 2012). In Sexton, our supreme court recognized that excluding jurors on the basis of a response to a single question in a jury questionnaire was "not permissible." Id. at 392-93. Instead, "[p]rior to disqualification of a prospective juror, the trial court should develop a process designed to definitively ascertain whether the juror is predisposed to a certain result [in a capital sentencing trial] regardless of the law." Id. at 393. And, in conjunction with implementing such a process,

> [o]nly a definitive answer that the prospective juror would either always vote for the death penalty or never vote for the death penalty regardless of the instructions of the trial court is the kind of predisposition which might "prevent or substantially impair the performance of [their] duties" as jurors and result in disqualification.

Id. (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)). In sum, our supreme court has cautioned that,

> eliminating prospective jurors based solely on an answer to one written question may result in the exclusion of those who are entirely capable of rendering a proper verdict, and, if a defendant is found guilty in a capital case,

-47-

imposing a sentence based on the law and the facts. Thus, trial courts must consider all of a juror's answers on a questionnaire, rather than giving just one answer dispositive weight, and should permit counsel to examine prospective jurors who provide inconsistent responses to pertinent questions.

Id. at 395.

Thus, absent other proof adduced at the post-conviction hearing, a petitioner claiming a biased jury must rely upon the transcript of the voir dire. See Holder v. Palmer, 588 F.3d 328, 339 (6th Cir. 2009) (where defendant is alleging ineffective assistance of counsel in jury selection, defendant "must show through a review of voir dire testimony that a 'fair trial was impossible'") (quoting Ritchie v. Rogers, 313 F.3d 948, 952 (6th Cir. 2002)). Our close review of the voir dire in this case belies the Petitioner's claim of a constitutionally infirm jury.

First, although the Petitioner claims in his brief to this Court that Trial Counsel was ineffective by failing "to adequately *voir dire* prospective jurors regarding their respective beliefs on capital punishment and the impact of pretrial publicity," the trial record reveals that the trial court questioned each of the jurors individually about pretrial publicity and their commitment to consider each of the three potential sentences should the Petitioner be found guilty of first degree murder. The prosecutor asked further questions of each juror individually about their commitment to consider each of the three potential punishments upon conviction. Moreover, Trial Counsel also asked questions in these areas. Unlike defense counsel in Smith, then, Trial Counsel in this case had adequate information upon which to determine whether further questioning was necessary on these points and whether to exercise challenges on these bases.

Moreover, our review of the voir dire of each of the twelve jurors who decided the Petitioner's case reflects that each juror met the constitutional standard of fairness and impartiality, i.e., each could lay aside any prior opinion about the case he or she may have held and render a verdict based on the evidence adduced in court. See Patton v. Yount, 467 U.S. 1025, 1037 n.12 (1984) (citing Irwin, 366 U.S. at 723); see also Wainwright, 469 U.S. at 424 (recognizing that the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath") (internal quotation marks omitted). "A qualified juror need not be 'totally ignorant of the facts and issues involved.'" Miller v. Webb, 385 F.3d 666, 673 (6th Cir. 2004) (quoting Murphy v. Florida, 421 U.S. 794, 800 (1975). "Rather, '[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" Id. (quoting Irwin, 366 U.S. at

723). While the Petitioner asserts that jurors Richardson, Brown, Shuffield, Spangenberger, Baggett, and Milliken had each "provided written or oral statements showing obvious bias regarding imposition of the death penalty and the impact of cases with child victims," the record of the actual voir dire demonstrates that each of these jurors was ably rehabilitated through explanations of the relevant law applicable to the imposition of the death penalty in Tennessee.

Richardson, who indicated on her jury questionnaire that she thought the death penalty should be automatic for anyone convicted of murdering a child, told the trial court that she had formed no opinion about guilt or punishment and that she could keep an open mind and be fair to both the Petitioner and the State. She also stated that she would be open to considering all three of the possible punishments should the Petitioner be convicted. When the prosecutor asked if she could set aside her earlier opinion that the death penalty should be automatic for the murder of children on being told by the trial judge that that was not the law in Tennessee, she answered affirmatively. She reiterated that she could consider all three possible punishments.

Brown, who also indicated on the questionnaire her belief that the death penalty should be automatic for the murder of children, likewise told the trial court that she had not formed an opinion about the case and would follow the law regarding the three possible penalties upon conviction of first degree murder. When the prosecutor explained that Tennessee law did not provide for the death penalty solely on the basis that a child was murdered, Brown stated that she would follow the law and consider all possible punishments.

Shuffield, who also indicated on the questionnaire his belief that the death penalty should be automatic for the murder of children, told the prosecutor that he could set this opinion aside and follow the law requiring that all three possible punishments be considered. He indicated to defense counsel that he would not automatically vote for the death penalty just because the victim was a child.

Spangenberger, who also indicated on the questionnaire his belief that the death penalty should be automatic for the murder of children, stated that he would follow the law requiring that all three punishments be considered. He stated that he had not formed any opinion about the case and noted that there were circumstances in which each of the three punishments would be appropriate.

Baggett, who also indicated on the questionnaire his belief that the death penalty should be automatic for the murder of children, stated during questioning that he would approach the case with an open mind and decide it solely on the evidence and the law. He

asserted that he would consider all three possible punishments and that he would set aside any personal feelings and follow the law.

Milliken stated during voir dire that she thought a case in which a life had been taken should carry the death penalty. After being told by the prosecutor that Tennessee law did not provide for the automatic imposition of the death penalty upon a first degree murder conviction, Milliken stated that she understood and that she could follow the law. She affirmed that she could be fair and impartial.

Trial Counsel challenged none of these jurors for cause. Moreover, the trial court did not excuse any of these jurors for cause on its own motion. See David Robert Ruderman v. Ryan, No. CV-09-0887-PHX-GMS, 2010 WL 2757282, at *5 (D. Ariz. July 13, 2010) (recognizing that, "[i]n cases where neither counsel requests that the juror be dismissed for cause, a trial court has a duty to dismiss the juror *sua sponte* where 'the evidence of partiality before the [trial] court' is highly 'indicative of impermissible juror bias.'") (quoting United States v. Mitchell, 568 F.3d 1147, 1151 (9th Cir. 2009)). Obviously, neither Trial Counsel nor the trial court was concerned that any of these jurors was biased against the defense, and the record before us does not demonstrate that any of these jurors was biased, either in fact or impliedly. Moreover, a trial court's assessment of a "juror's ability to adhere to [his or] her oath . . ., based upon not only the answers to questions posed by counsel but also nonverbal responses, is owed deference." State v. Odom, 336 S.W.3d 541, 559 (Tenn. 2011) (citing Uttecht v. Brown, 551 U.S. 1, 9 (2007)). Also, where "the record shows that jurors were duly elected, empaneled, tried, and sworn, it is presumed that they were fair and impartial jurors, since the trial judge has the exclusive right to pass on their selection." Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974). "To overthrow this presumption of competency, a clear case must be made out against it." Id. We also note that the Tennessee Supreme Court has already determined that the Petitioner's jury was not prejudiced by pretrial publicity. See Rogers, 188 S.W.3d at 622 (appx). The Petitioner has failed to demonstrate that he is entitled to relief on this basis.

The Petitioner also argues that Trial Counsel was ineffective in failing to ask any of the jurors about "any mitigation concepts." While we acknowledge that Trial Counsel did not pursue this line of inquiry during voir dire, this Court has recognized that "[t]he failure to make certain inquiries to determine how receptive the jury would be to specific mitigation factors during voir dire does not necessarily constitute ineffective assistance of counsel." Steven Ray Thacker v. State, No. W2010-01637-CCA-R3-PD, 2012 WL 1020227, at *53 (Tenn. Crim. App. Mar. 23, 2012) (citing State v. Goodwin, 703 N.E.2d 1251, 1257 (Ohio 1999)). In Thacker, rejecting a similar argument, this Court noted that the jurors had been "questioned as to their ability to follow the law" and that "[t]he trial court instructed the jury of the applicable legal burdens and on mitigating circumstances." Id. This Court

emphasized that, "'where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the [petitioner] to show that a juror is in some way biased or prejudiced.'" Id. (quoting State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993)). Because the petitioner had "offered no evidence to establish that the jury ultimately empaneled was biased or unfair," this Court denied relief. Id.; see also Christa Gail Pike v. State, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *59 (Tenn. Crim. App. Apr. 25, 2011), perm. app. denied (Tenn. Nov. 15, 2011) (affirming trial court's denial of post-conviction relief where petitioner claimed trial counsel was ineffective in failing to inform the jury during voir dire that the petitioner's youth was a statutory mitigating factor, in failing to discuss mitigation themes of mental illness, psychology, and mental health experts, and in failing to question the venirepersons about their beliefs on interracial dating and Satanism). The same result, for the same reasons, applies in this case.

The Petitioner also makes numerous assertions regarding Trial Counsel's performance during voir dire with respect to venirepersons who were not eventually seated on the Petitioner's jury. However, the obvious corollary to the prerequisite that a post-conviction petitioner alleging ineffective assistance of counsel during jury selection must prove that the eventual jury was biased, is that the trial lawyer's performance with respect to jurors who were not ultimately seated on the jury is irrelevant.

Therefore, we emphasize that a post-conviction petitioner raising this issue must focus the proof and argument on the jurors who actually sat and passed judgment on the petitioner. In this case, the Petitioner makes numerous claims of ineffective assistance of counsel during jury selection by pointing to Trial Counsel's questions (or lack thereof) and/or challenges (or lack thereof) to venirepersons who eventually were eliminated from the jury pool. Trial Counsel's voir dire and challenges as to these venirepersons are simply irrelevant to the Petitioner's claim of ineffective assistance of counsel. The Petitioner cannot prove that he was judged by a constitutionally infirm jury by reference to persons who were not on the jury. Accordingly, we need not address the Petitioner's specific claims in this case arising from Trial Counsel's performance regarding potential jurors who did not actually sit in judgment of the Petitioner at trial.

The Petitioner also claims that Trial Counsel "wholly abandoned his role as an advocate, and failed to act as an adversary during the *voir dire* process" such that this Court should consider his performance ineffective per se. The Petitioner relies on United States v. Cronic, 466 U.S. 648 (1984), for this proposition. We, however, disagree that Cronic supports his position. Cronic makes clear that there are exceptional circumstances "that are so likely to prejudice the accused" that a violation of the Sixth Amendment right to counsel is presumed. Id. at 658. Such exceptional circumstances include "the complete denial of counsel" during "a critical stage of [the] trial," id. at 659; the complete failure by counsel "to

subject the prosecution's case to meaningful adversarial testing," id.; the denial of the right to cross-examination, id.; and where "counsel labors under an actual conflict of interest," id. at 662 n.31. The instant case does not present any such exceptional circumstances. Contrary to the Petitioner's claims, Trial Counsel actively participated during voir dire, even to the extent of utilizing the services of a jury consultant. The Petitioner is not entitled to relief on this basis.

To the extent that the Petitioner claims that Trial Counsel was ineffective because only one of them participated in the jury selection process, allegedly in violation of Tennessee Supreme Court Rule 13, section 3, we agree with the State that the cited rule does not require the participation of both attorneys in all decisions related to the representation. Rule 13, section 3(b)(1) simply states that the trial court "shall appoint two attorneys to represent a defendant at trial in a capital case." Moreover, as noted earlier, post-conviction relief is warranted only when a petitioner establishes that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. As such, any violation of Rule 13 arising from any failure on attorney Converse's part to participate in the jury selection process would not entitle the Petitioner to post-conviction relief.

Finally, we reject the Petitioner's claim that Trial Counsel "were further ineffective in their failure to object, preserve, raise, and appeal the *voir dire* issues" set forth in his brief. We have determined that the Petitioner suffered no prejudice from Trial Counsel's performance during jury selection because he has failed to demonstrate that a biased jury resulted. According to the Tennessee Supreme Court:

> If a claim of ineffective assistance of [appellate] counsel is based on the failure to raise a particular issue, . . . then the reviewing court must determine the merits of the issue. Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise this issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of [appellate] counsel claim.

Carpenter, 126 S.W.3d at 887-88 (citation omitted). We have determined that the Petitioner's jury passed constitutional muster. An appeal on any of the issues raised by the Petitioner regarding jury selection would therefore have been fruitless. See State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993) (whether or not the trial court should have excluded challenged jurors for cause, any possible error was harmless unless the jury who actually

-52-

heard the case was not fair and impartial); see also State v. Schmeiderer, 319 S.W.3d 607, 633 (Tenn. 2010) ("The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him."). Accordingly, the Petitioner is entitled to no relief on this basis.

Although we have determined that the Petitioner is not entitled to relief on the basis of Trial Counsel's performance during jury selection because he has failed to demonstrate the prejudice prong of his ineffective assistance of counsel claim, we choose also to address his assertion that, "[i]nasmuch as 'trial strategy' is the state's *defense* to a claim of ineffective assistance articulated in a petition for post-conviction relief, the burden of proving strategy is on the [State], not on the [P]etitioner." (Emphasis added.) Not surprisingly, perhaps, the Petitioner cites us to no authority for this novel assertion, and we expressly reject the Petitioner's assertion on this point. It is well-established that a trial lawyer is *presumed* to have represented his or her client pursuant to sound trial strategy. See Strickland, 466 U.S. at 689. Accordingly, "[j]udicial scrutiny of [an attorney's] performance is *highly deferential*," Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000) (emphasis added), and a petitioner alleging deficient performance bears the *heavy* burden of proving that his or her lawyer's performance was *not* within the realm of competent trial strategy. See Strickland, 466 U.S. at 689; Tracy F. Leonard v. State, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *20 (Tenn. Crim. App. July 5, 2007). Thus, the fact that the State did not call attorney Warner to the stand to explain his performance during jury selection does not accrue to the Petitioner's benefit.

Nor do we agree with the Petitioner that this Court's decision in Timothy Terell McKinney v. State, No. W2006-02132-CCA-R3-PD, 2010 WL 796939 (Tenn. Crim. App. Mar. 9, 2010), perm. app. denied (Tenn. Aug. 25, 2010), supports his argument. In McKinney, the capital post-conviction petitioner alleged ineffective assistance of counsel at trial but was unable to adduce testimony from one of his trial lawyers at the post-conviction hearing because the trial lawyer was ill. See id. at *29. The petitioner nevertheless adduced proof through other sources that his trial lawyers failed to utilize significant and substantial evidence at trial that they "knew of or should have known of" and which was damaging to the State's case, thereby "fail[ing] to subject the prosecution's case adequately to the adversarial process." Id. at *36. Noting that the evidence against the petitioner at trial "was not overwhelming," id., this Court concluded that trial counsel's demonstrated deficiencies "undermined confidence in the outcome of the trial." Id. at 37. Therefore, this Court granted relief. Id. at *56.

In McKinney, this Court determined that relief was appropriate based upon the extensive testimony presented at the post-conviction hearing from one of the petitioner's trial attorneys, the owner of the private investigation firm and one of his employees who were

-53-

hired by counsel to assist the defense, and numerous lay witnesses who testified at the post-conviction hearing but not at trial on the subject of whether others may have had motive for the crime and whether the eyewitness descriptions of the perpetrator matched the petitioner. See id. at *5-18. In fact, the attorney who testified at the post-conviction hearing in McKinney stated that the defense theory in that case was that "the victim was shot and that there was very little evidence as to who committed this crime, so the defense for the [defendant] was mistaken identity or that essentially that he was not the person who committed this crime." Id. at *12. In other words, the combination of all the proof presented at the post-conviction hearing, including one of the defense lawyer's testimony, negated the presumption that the identified deficiencies on counsel's part were the result of trial strategy. With regard to the claimed deficiency attributable only to the attorney who did not testify at the post-conviction hearing in McKinney, this Court noted that no proof had been presented "as to the basis of [that attorney's] decision," and that, "[a]bsent such proof, this Court will not conclude that counsel blindly refused to engage in the adversarial process." Id. at *29. In sum, McKinney clearly is distinguishable from this case and does not control the outcome of this post-conviction proceeding.

In his reply brief, the Petitioner reiterates this approach, arguing that his burden is limited to proving "by clear and convincing evidence the *fact* of counsel's alleged error" and that the post-conviction court must thereupon determine whether the "alleged error" fell below an objective standard of reasonableness. Notably, the rest of the Petitioner's argument reveals his interpretation that, by simply proving that trial counsel committed or omitted some action during trial preparations and/or at trial and by then labeling same an "error," the burden then shifts to the State to demonstrate that the alleged "error" was reasonable trial strategy. Again, this is not the law. A post-conviction petitioner must establish *both* that the action was taken (commission) or not (omission) *and* that the same was *erroneous* within the context of the proceeding. We acknowledge that a very few commissions or omissions by trial counsel can be "objectively unreasonable" on their face. See, e.g., Smith, 357 S.W.3d at 347-48. Such errors are rare, however, and the Petitioner has identified no such errors during the voir dire of his trial. Therefore, we hold that the post-conviction court committed no error in its application of the burden of proof in this case.

In summary, the Petitioner has failed to establish that any of the jurors who actually sat on his case were biased, partial, or incompetent. The record before this Court, including both the record from the Petitioner's trial and the record of the post-conviction proceeding, simply does not establish that Trial Counsel's performance during jury selection led to a constitutionally infirm jury. Accordingly, we hold that the Petitioner has failed to establish that Trial Counsel rendered ineffective assistance of counsel during jury selection, and he is entitled to no relief on this basis.

## B. Pretrial Investigation

In his second issue on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that Trial Counsel provided constitutionally ineffective assistance with regard to their duty to conduct an adequate pretrial investigation concerning (1) the circumstantial evidence of the Petitioner's guilt and (2) the expert testimony they obtained for use during their case for mitigation at the penalty phase. Specifically, the Petitioner alleges that Trial Counsel: (1) failed to investigate adequately the serological evidence obtained from the victim's shorts in order to undermine the State's position that the victim had been raped at or near the time of her death; (2) failed to appreciate the exculpatory significance of the pretrial forensic report indicating that none of the soil recovered from the Petitioner's cars or clothing matched soil samples recovered from the location where the victim's body was found; (3) failed to review adequately the pretrial forensic reports from the Federal Bureau of Investigation (FBI) concerning the carpet fiber evidence and develop crucial discrepancies in the evidence that would have undercut the State's position at trial that fibers consistent with carpet in the Petitioner's house were found in his car and on the victim's shorts; (4) failed to investigate adequately the time it would have taken the Petitioner to travel the distances necessary to commit the crime and dispose of the victim's body such that an alibi defense would have been successful; (5) failed to investigate and obtain evidence indicating that the Petitioner was coerced into making his statements to law enforcement; and (6) failed to review adequately the report prepared by Dr. Keith Caruso and the prejudicial effect Dr. Caruso's testimony would have on their case for mitigation at sentencing.

## 1. Investigation of Serological Evidence

The State's proof at trial that the Petitioner raped the victim was entirely circumstantial and based on Squibb's testimony. Our review of the trial record reveals that Squibb's entire testimony covers only thirty pages of transcript. On direct examination, Squibb explained that, when testing an item for the presence of semen, he first performed "an initial test." If this preliminary screening test yielded a positive result, he then performed "a confirmatory test." Squibb did not explain the background or details of either of these tests. When asked about testing the victim's shorts for semen, Squibb testified that he "found that semen was present on the shorts." He clarified that three areas in the crotch portion of the shorts yielded "positive semen stains" while a fourth area "was inconclusive for semen." He also explained that, when he received the shorts, they "were very brittle and fell apart eas[ily]." The following colloquy between the prosecutor and Squibb ensued:

> Q: And in reviewing your – reports, you refer to semen fluid and sperm, is there a difference between those?

A:  Sperm is a component of semen fluid.

Q:  Were both found on these shorts?

A:  The presence of sperm indicates that semen was also present since sperm
is a component of semen.

Squibb's "reports" were not admitted into evidence.[5] Squibb testified that he also tested the
shorts for blood but his tests "failed to indicate the presence of blood."

In addition to testing the victim's shorts, Squibb tested the victim's sandals and shirt
for blood and semen.  The tests were "inconclusive for the presence of blood" and "failed to
indicate the presence of semen."

When asked on direct examination whether the semen on the shorts was human,
Squibb responded, "I could not tell.  It appeared to be human sperm; however, there are other
species which are very close to it, but I did not see any difference between the sperm that I
viewed as opposed to a human sperm."

On cross-examination, Squibb stated that he did not attempt to generate a DNA profile
from the semen stains on the shorts.  He also explained the differences between the three
areas of the shorts that he concluded contained semen stains and the fourth "inconclusive"
area: "There was some possible sperm heads [in the fourth area], they were not what I would
call a 'sperm head,' so I left it as an inconclusive.  The other [three areas], I had sperm head
present so I called it sperm and therefore, semen is present."  Squibb also acknowledged that
he tested the Petitioner's white Chevrolet car for semen and blood and that the tests "failed
to indicate the presence of blood and semen."

On redirect, Squibb clarified that he tested the inside of the shorts.  He also clarified
the difference between presumptive and confirmatory tests for semen:

The presumptive test is acid phosphatase, and that is like quick
screening of an exhibit to kind of concentrate on possible semen stains,
assuming there is a positive area.  If it is negative, then no further testing will

---

[5] Trial Exhibit 112, admitted during Squibb's testimony, is a single sheet of paper containing
handwritten notes and two diagrams of a pair of shorts.  Squibb referred to this document as "a copy of a
work sheet that [he] generated in the lab."  At the post-conviction hearing, a copy of Squibb's "Official
Serology Report" was admitted into evidence as an exhibit.

be performed on the exhibit. But if I get a positive reaction, I can then come in on that localized area and further test, do my confirmatory tests.

Squibb added that, on the four areas of the shorts that he tested for semen, the presumptive tests were all positive. The confirmatory test was positive on only three of the four areas.

Squibb was not asked to describe what the "confirmatory test" consisted of or how it was conducted. Nor was he asked any detailed questions about the science underlying any of the tests or the level of reliability associated with any of the tests.

Meghan Clement testified at trial that she tested the cuttings from the shorts for DNA but was unable to obtain a sequence. Therefore, she was unable to compare any DNA on the shorts to the Petitioner's DNA sample. She explained that there were four possible reasons for the inability to obtain a DNA sequence: (1) the DNA was "too degraded"; (2) there was an insufficient quantity of DNA on the cuttings; (3) the samples contained "a mixture of more than one DNA . . . so we couldn't get a clean sequence"; and (4) there may have been "chemical inhibitors from environmental insults such as dirt." On cross-examination, Clement acknowledged that, if her inability to obtain a DNA sequence was due to a mixture of sources, it was possible that there were "two donors of semen."

In denying relief on the Petitioner's claim that Trial Counsel was ineffective in cross-examining these witnesses and failing to adduce proof that the sperm heads found on the shorts could have been the result of laundering, the post-conviction court relied on the following analysis:

> The testimony of Ms. Clement and Mr. Squibb at the [post-conviction] hearing reveals certain deficiencies in Mr. Warner's cross-examination of those witnesses at trial. Mr. Squibb's testing produced evidence favorable to the petitioner, but counsel did not present some of this evidence to the jury. For instance, the jury did not hear there were very few (or "rare," the term used by the TBI lab to denote fewer than ten) sperm heads found on the microscopic slides developed from the victim's shorts. Mr. Squibb was also not asked about his testing for semen in great detail; the jury heard no information about the mechanics of the acid phosphatase test (color changes, timing, etc.) or that Mr. Squibb's acid phosphatase test yielded a "weak" positive result. The jury heard nothing about the P30 antigen as it related to seminal fluid or that Mr. Squibb's testing yielded negative results for P30. The jury also did not hear that very little DNA was derived from the stains taken from the victim's shorts. Perhaps most relevant, counsel for the petitioner did not present evidence attacking Mr. Squibb's conclusion that the presence of sperm cells necessarily

-57-

indicated the presence of semen. Given Ms. Clement's testimony and the publication of the washing machine study in the Canadian forensic journal – an article published some four years before the trial in the instant case – such evidence was available to counsel.

However, although counsel rendered deficient performance in not presenting this evidence to the jury, this deficiency did not prejudice the petitioner. Counsel were still able to present to the jury that the DNA and serology evidence in this case was largely inconclusive. For instance, Mr. Squibb testified that no blood was found in the victim's shorts and that no blood or semen were found on the victim's shirt or inside the petitioner's car. Ms. Clement testified that no DNA sequence could be generated from the victim's shorts – thus, what little DNA evidence that existed could not be connected conclusively to the petitioner. Mr. Squibb also testified that while the sperm cells "appeared" to be human, he could not conclude that the sperm cells were not animal in nature.

The petitioner's attack on the evidence supporting the rape-related offenses in this case was multi-faceted. Counsel argued that the petitioner did not have enough time to commit the offenses, that there was no evidence that he committed these offenses in Montgomery County, and that there was no evidence conclusively establishing that he was the person who committed any sexual offenses against the victim. Although the petitioner's case could have been strengthened by the inclusion of the scientific and technical evidence produced at the [post-conviction] hearing, counsel still presented ample evidence attacking the entirely circumstantial evidence regarding the rape-related offenses. Despite this evidence, the jury still chose to convict the petitioner; even if counsel had presented the additional evidence to the jury, there is not a reasonable probability that the jury's verdict in this case would have been different.

We agree with the post-conviction court's analysis. Certainly, Trial Counsel should have done a more thorough job attacking Squibb's testimony. However, the fact remains that Squibb found sperm heads on the fabric samples taken from the crotch area of the victim's shorts. Clement agreed at the post-conviction hearing with Squibb's finding of sperm heads. The victim's mother testified at trial that the victim had put the shorts on right before leaving her house and disappearing. While Clement's testimony at the post-conviction hearing established that it is possible for sperm heads to arrive on clothing while being laundered in a washing machine, she also testified that the experiments in which such transfer occurred involved washing new clothing with "a pair of underwear worn by someone who had

consensual relations." Thus, proof of these experiments would not have been relevant at trial unless the defense had also been able to establish at least some probability that the victim's shorts had been washed with an item containing semen. No such probability was established at the post-conviction hearing. Therefore, we cannot conclude that Trial Counsel's performance in his cross-examination of Squibb prejudiced the Petitioner.

In sum, Trial Counsel should have attacked the State's proof regarding the semen/sperm issue with more vigor. The Petitioner, however, has not established that the jury's verdicts are unreliable as a result of this failure because there has been no showing that the defense would have been able to eliminate or completely discredit the State's proof that sperm heads were found in the crotch area of the victim's shorts. That proof, together with the substantial proof at trial that the Petitioner was the last person to see the victim alive, leaves us confident in the jury's verdict. Accordingly, the Petitioner is not entitled to relief on this basis.

The Petitioner also asserts that Trial Counsel was ineffective in not challenging the admissibility of the DNA testing and in not pursuing the theory that the DNA testing was inconclusive "because the substance was not human biological material." This issue is without merit. As noted by the post-conviction court, "[t]he inconclusive nature of the DNA evidence went to the evidence's weight, not its admissibility." Moreover, Trial Counsel emphasized through Squibb the possibility that the sperm heads were not human. The Petitioner is not entitled to relief on this basis.

## 2. Failure to Investigate Soil Evidence

The Petitioner claims that Trial Counsel was ineffective in failing to adduce "exculpatory soil evidence which excluded [him] as having been present at the crime scene at Land Between the Lakes where the [victim's] remains were found." This assertion is based upon an FBI Report of Examination prepared by Bruce W. Hall on July 15, 1997, and which states, in toto, the following "Results of Examinations":

> Among the soil samples collected from where the victim was last seen, specimens K1 through K5, specimen K3 is characteristic of soil recovered from the subject's vehicle, specimen Q1. Soil representing the road associated with the body recovery site, specimen K15 through K18, although seeming similar to the soil recovered from the subject's vehicle, is dissimilar. Soil recovered from the subject's shirt, shoes and sandals, specimens Q13, Q14, Q15 and Q27 respectively, is likewise dissimilar and cannot be associated with any of the aforementioned known soil samples as well as those collected from where the victim was found, specimens K12 through K14.

Although this report is certainly intriguing, the Petitioner cannot ask either a post-conviction court or an appellate court to draw from it the conclusion that it excluded the Petitioner as the person who deposited the victim's body where it was found in Land Between the Lakes. The Petitioner called no one at the post-conviction hearing to testify about this report or to explain its conclusions and/or other data necessary for interpreting the significance of the results.

Thus, again, the Petitioner has failed to demonstrate that he was prejudiced by Trial Counsel's "failure" to utilize this information at trial. As noted by the State in its brief to this Court, the soil samples collected by law enforcement personnel from the Petitioner's car were collected *after* the car had been cleaned, according to the Petitioner's wife's testimony. The State therefore had a ready explanation had Trial Counsel elicited the lack of a match between the soil samples collected from the area in which the victim was found and the soil samples collected from the Petitioner's car. Also, absent proof that the Petitioner's clothing from which additional soil samples were collected was the same *unwashed* clothing that the Petitioner was wearing during the afternoon of July 8, 1996, the lack of a match would have been irrelevant. In this regard, we note that a typed report by the FBI, made an exhibit to the post-conviction hearing, relates that, on July 11, 1996, during the search of the Petitioner's residence, the Petitioner's wife "provided . . . clothing she believes was worn by [the Petitioner] on July 8, 1996. A red 'Nike' T-shirt was recovered from the dryer. [The Petitioner's wife] advised the T-shirt had been washed and dried. [The Petitioner's wife] provided a pair of blue jeans from the washer. The blue jeans were still wet from being washed." Therefore, Trial Counsel's "failure" to adduce the proof about the soil samples does not render the jury's verdicts unreliable. The Petitioner is not entitled to relief on this issue.

### 3. Fiber Evidence

The Petitioner contends that Trial Counsel was ineffective in failing to exploit discrepancies in some of the State's proof regarding fibers found on the victim's clothing and in the Petitioner's cars and home. The Petitioner asserts in his brief to this Court that "[t]hese discrepancies were not utilized in cross-examination of any of the State's witnesses, and the jury was left with the State's unchallenged yet dubious story of 'fiber transfer' which tied [the victim] to [the Petitioner's] car."

To the contrary, testimony by the State's own witnesses during both direct and cross-examination established discrepancies in the fiber evidence and created questions about the fiber transfer. TBI Agent Linda Littlejohn testified at trial that the fibers she found on the victim's clothing did not match the fibers from the carpet and seat standards taken from the Petitioner's cars. FBI scientist Max Michael Houck testified that fibers found in vacuumings

from the Petitioner's two vehicles and on the victim's shorts "exhibited the same microscopic characteristics and optical properties as the known fibers from the [Petitioner's] living room carpet." Trial Counsel conducted a thorough cross-examination of Houck, eliciting testimony that established that the fibers on the victim's shorts could have resulted from a transfer that involved neither the victim's presence in the Petitioner's living room or in either of his cars. Trial Counsel also attacked the reliability and validity of the asserted consistencies by pointing out that the fibers from the Petitioner's living room carpet were not obtained until mid-1997. Trial Counsel also obtained Houck's admission that a fiber examination "is not like a fingerprint or a six probe DNA match." FBI chemist Ronald Menold testified that the fibers "were consistent with each other in polymeric composition and that that composition was consistent with polyethylene carasylate (phonetic), which is a sub-class of a polyester fiber." Trial Counsel also conducted a thorough cross-examination of this witness, eliciting, among other things, Menold's admission that the FBI's Handbook of Forensic Science stated that such consistency was "not positive evidence but good circumstantial evidence."

The Petitioner has failed to demonstrate how the absence of further attacks on the State's fiber proof renders the jury's verdicts unreliable. We note, in particular, that the Petitioner admitted to law enforcement officers that the victim had been in his car. The Petitioner is not entitled to relief on this basis.

### 4. Alibi Evidence

The Petitioner claims that Trial Counsel performed inadequately in presenting proof that it was physically impossible for him to have committed the crimes of which he was convicted between the time that the victim disappeared and the time that witnesses saw him at the Phillips 66 on Riverside Drive in Clarksville. At the post-conviction hearing, the Petitioner adduced proof that it took two hours and forty-four minutes to travel from the victim's home to Land Between the Lakes, walk the distance to and from the area where the victim's body was found, and return to the Phillips 66. The proof at trial demonstrated that the victim was kidnapped at approximately 1:40 p.m. and that, according to the defense theory, the Petitioner was seen at 4:00 that same day at the Phillips 66: a period of only two hours and twenty minutes. The Petitioner asserts that Trial Counsel did not establish this significant time discrepancy at trial.

The post-conviction court denied relief because similar proof was adduced at trial through Investigator Batson and Trial Counsel utilized that proof to argue to the jury that there was not sufficient time for the Petitioner to have committed the crimes. We agree with the post-conviction court that Trial Counsel was not ineffective in this regard. This defense theory depended upon the jury's accepting the testimony of the alibi witnesses, testimony

which the jury rejected, as was its prerogative. The State's theory, based on the Petitioner's wife's testimony, was that the Petitioner was not seen back in Clarksville until 6:00 that evening, providing him with ample time to commit the crimes. The jury clearly accredited the State's theory over the Petitioner's. Trial Counsel was not ineffective in this regard, and the Petitioner is not entitled to relief on this basis.

## 5. Psychological Evidence

The Petitioner contends that Trial Counsel was ineffective in failing to investigate and subsequently adduce expert proof at the motion to suppress his statement that his statement was coerced, involuntary, and unreliable. In support of this contention, the Petitioner points to Dr. Auble's testimony at the post-conviction hearing, observing that Dr. Auble would have been available to evaluate the Petitioner and testify at the suppression hearing. The Petitioner asserts in his brief to this Court that, "[h]ad Dr. Auble's testimony been presented, his statement would have been suppressed[,]" "excluded . . . due to its extreme unreliability, or its impact on the jury would have been minimized by Dr. Auble's testimony." The post-conviction court ruled as follows on this issue:

> [T]he substance of Dr. Auble's [post-conviction] hearing testimony was that the petitioner confessed to running over the victim with his car because the police led him to believe that he would be charged with a lesser offense (i.e., vehicular homicide as opposed to first degree murder) if he confessed to running over the victim with his car. However, this assertion is inconsistent with the testimony from the suppression hearing, and at the [post-conviction] hearing Mr. Batson testified that the police did not induce the petitioner to confess by promising he would be charged with a lesser offense. Rather, Mr. Batson testified that as the police took the petitioner back to the criminal justice center after visiting the hospital, the petitioner asked, without prompting, "Will I be charged with vehicular homicide?" Mr. Batson testified that he then told the petitioner that he would explain the charges to [him]. Mr. Batson also said that before this statement, none of the law enforcement agents suggested that the petitioner had run over the victim with his car.
>
> In light of the evidence, the court concludes that to any extent that counsel may have been ineffective for not arguing that the petitioner's statement was coerced or otherwise involuntary, and for not presenting expert witness testimony in support of this assertion, such actions did not prejudice the petitioner.

In essence, the post-conviction court made a finding of credibility in favor of Investigator Batson and against Dr. Auble. The evidence does not preponderate against this finding. Therefore, we may not overturn it. See Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Dyron Norm Yokley, No. E2009-02646-CCA-R3CD, 2011 WL 2120096, at *26 (Tenn. Crim. App. May 20, 2011), perm. app. denied (Tenn. Sept. 21, 2011) (recognizing that this Court "is not at liberty to reevaluate matters of witness credibility unless the evidence preponderates against the trial court's findings"). The Petitioner is not entitled to relief on this basis.

## 6. Mitigation Expert's Report

Finally, the Petitioner contends that Trial Counsel "failed to adequately investigate its own expert's opinion, resulting in the introduction of evidence which supported the State's case for the death penalty." The Petitioner refers to Dr. Keith Caruso's testimony and report presented by the defense during the sentencing phase of his trial, particularly Dr. Caruso's testimony, "I think [the Petitioner] hasn't been able to admit to himself that he did these things yet, so it is difficult to say whether or not – I don't see that he entirely lacks remorse. I don't see him as being very far long [sic] in the pattern of remorse or feeling sorry for what he has done yet." The Petitioner argues that Dr. Caruso impliedly endorsed the jury's finding of guilt, "thereby crippling any residual doubt argument as a mitigating factor." He asserts, "Surely it cannot be disputed that a careful reading of Dr. Caruso's report, particularly in light of the far more favorable report of Dr. Neilson . . . , would cause a lawyer exercising reasonable professional judgment to decline to present Dr. Caruso as an expert."

To prove the prejudice prong of ineffective assistance of counsel during the capital sentencing phase of the petitioner's trial, the petitioner must establish that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. In determining whether defense counsel was ineffective in its investigation of and/or presentation of mitigating evidence, the reviewing court must "analyze[] the nature and extent of the mitigating evidence that was available but not presented," determine "whether substantially similar mitigating evidence was presented to the jury during either the guilt or penalty phase of the proceedings," and consider "whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination." Goad, 938 S.W.2d at 371. When the petitioner argues, as here, that *prejudicial* "mitigation" evidence was presented, we construe the first of these factors as referring to the nature and extent of the allegedly prejudicial evidence presented and the third factor as referring to whether the evidence of the applicable aggravating factors was so strong that the absence of the allegedly prejudicial mitigating evidence would not have affected the jury's verdict.

After reviewing the trial testimony of both Dr. Caruso and Dr. Neilson, who also testified in mitigation for the Petitioner at trial, the post-conviction court found that

> Dr. Caruso's assessment of the petitioner [was not] significantly less favorable to the petitioner than Dr. Neilson's assessment. Although Dr. Caruso did not diagnose the petitioner with the same (or as many) disorders as did Dr. Neilson, Dr. Caruso testified that the petitioner' actions were affected by – although if not caused by – the extreme emotional distress resulting from the petitioner's upbringing.

> Furthermore, the evidence of the four aggravating circumstances was substantial, so even if Dr. Caruso's testimony had not been presented to the jury, Dr. Neilson's testimony, standing alone, would not have affected the jury's sentencing decision.

We agree with the post-conviction court on this issue. Moreover, while the Petitioner has couched this contention in terms of inadequate investigation, the real thrust of his complaint is that Trial Counsel made a poor tactical decision in calling Dr. Caruso to testify. The record, however, does not support the conclusion that Trial Counsel's strategic choice in this regard fell so far below the level of reasonable performance as to constitute deficient performance. For instance, we note that Converse testified that one of the reasons the defense called Dr. Caruso was to counteract the State's claim that the Petitioner suffered from pedophilia. The Petitioner is not entitled to relief on this basis.

### C. Pretrial Motions

In his third issue on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that Trial Counsel provided constitutionally ineffective assistance with regard to the filing of certain necessary pretrial motions. Specifically, the Petitioner alleges that Trial Counsel: (1) failed to support adequately with proper citation to legal authority or evidence the motion to dismiss, which was construed by the trial court as a motion to dismiss based upon a violation of the Petitioner's right to a speedy trial; (2) failed to assert adequately as a basis for the motion to dismiss the prosecutorial misconduct by the State in not providing discovery to the defense in a timely fashion; (3) failed to file a motion for a bill of particulars asking the State to provide the date, time and location of each offense alleged in the indictment; (4) failed to file a pretrial motion seeking exclusion of testimony from the Petitioner's wife, Juanita Rogers, concerning certain privileged marital communications; (5) failed to present a constitutionally adequate motion to suppress the Petitioner's statements to law enforcement; (6) failed to challenge Montgomery County as the proper venue for the

homicide and rape charges; and (7) failed to seek severance of the rape of a child offense from the remaining counts charged in the indictment.

The post-conviction court denied the claims related to Trial Counsel's failure to file a motion for a bill of particulars and failure to file a pretrial motion seeking exclusion of the Petitioner's wife's testimony at trial on grounds that the Petitioner failed to adduce proof as to why Trial Counsel did not pursue these motions, leaving it to speculate as to Trial Counsel's performance.[6] The record supports the post-conviction court's findings on this issue. Accordingly, the Petitioner has failed to prove these claims, and they properly were denied. See Gdongaley P. Berry v. State, No. M2010-01136-CCA-R3-PD, 2011 WL 5326280, at *8 (Tenn. Crim. App. Nov. 4, 2011), perm. app. denied (Tenn. Feb. 16, 2010) (rejecting claim of ineffective assistance of counsel where petitioner did not question his attorneys about the claimed deficiencies, leaving the court to speculate as to their performance). We address the remaining claims on this issue below.

### 1. The Bloodworth Motion to Dismiss

As the State asserts in its brief, the Petitioner failed to prove by clear and convincing evidence that Trial Counsel performed deficiently with regard to the motion to dismiss filed by Charles Bloodworth. Although the Petitioner presented testimony at the post-conviction hearing regarding Bloodworth's reasons for filing the motion and the sequence of events leading up to its filing, the record is silent as to the arguments and evidence actually presented by Bloodworth at the hearings on the motion. This is so because the record from the Petitioner's direct appeal, which was incorporated by reference into the post-conviction record, does not contain the transcripts from the three separate hearings held in 1997 on the motion and referred to by the trial court in the order denying the motion to dismiss. The post-conviction court properly concluded that the Petitioner's failure to include these transcripts in the record "limited" its "ability to review the issue."[7] Moreover, this Court is precluded from considering an issue when the record is incomplete and does not contain a transcript of the proceedings relevant to the issue presented for review. State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). As such, the Petitioner has failed to demonstrate that the post-conviction court erred in denying his claims that Bloodworth provided ineffective

---

[6] The post-conviction court also determined that Mrs. Rogers' testimony was not subject to exclusion under the marital communications privilege.

[7] After reviewing the motion and the trial court's order, the post-conviction court also concluded that the Petitioner had failed to establish "that the trial court would have granted the petitioner's motion to dismiss had Mr. Bloodworth raised different arguments in the motion."

assistance with regard to the arguments and proof presented in support of the motion to dismiss.

## 2. Failure to File Adequate Motion to Suppress

Prior to trial, Trial Counsel filed a motion to suppress the Petitioner's statements to law enforcement. After a hearing, at which several witnesses testified, the trial court denied the motion. The Petitioner maintains that counsel was ineffective in presenting the motion, asserting in his brief to this Court that Trial Counsel failed to argue that the Petitioner had been subjected to custodial interrogation prior to receiving his Miranda warnings, thereby rendering inadmissible the statements he gave after receiving the Miranda warnings. See Missouri v. Seibert, 542 U.S. 600, 613-14, 617 (2004); State v. Dailey, 273 S.W.3d 94, 107-110 (Tenn. 2009). Therefore, to prevail on this claim, the Petitioner must establish that he was "in custody" prior to having received the Miranda warnings.

In State v. Anderson, the Tennessee Supreme Court held that the test for determining whether a suspect is in custody and entitled to Miranda warnings is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." 937 S.W.2d 851, 855 (Tenn. 1996). See also Berkemer v. McCarty, 468 U.S. 420, 441-42 (1984). The Anderson court set forth the following non-exclusive list of factors relevant to this "objective assessment":

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Anderson, 937 S.W.2d at 855. The Anderson court stressed that the determination of whether a suspect is in custody for Miranda purposes is a "very fact specific inquiry." Id.

During the post-conviction hearing, the Petitioner adduced no testimony relevant to this issue from any of the participants in the Petitioner's initial questioning. Thus, we are left

with only the testimony adduced during the hearing on the motion to suppress from which to glean the Petitioner's custodial status prior to the time he was given his Miranda warnings.

Sergeant Clifton Smith of the Montgomery County Sheriff's Department testified that he initially approached the Petitioner at the Petitioner's job site. Sgt. Smith then left and spoke with the Petitioner's wife. After this conversation, Sgt. Smith returned to the Petitioner's job site and asked the Petitioner if he was willing to accompany Sgt. Smith to the Criminal Justice Center for an interview. The Petitioner answered affirmatively and followed Sgt. Smith to the Criminal Justice Center in the Petitioner's own vehicle. When they arrived, the Petitioner accompanied Sgt. Smith into the building. The Petitioner was not placed in handcuffs, nor was he placed under arrest. The men entered an interview room and the Petitioner took a seat. Sgt. Smith testified that Investigator Billy Batson and FBI Special Agent Brett Murray were also in the room. By this time it was approximately 10:45 in the morning. Special Agent Brett Murray began to question the Petitioner about his possible involvement in the victim's disappearance. Sgt. Smith testified that, at this point in time, the Petitioner was not the only suspect in the case. During the interview, the Petitioner "said that he was the one that we were looking for," apparently referring to a composite drawing that had been composed. At that point, 11:18 that morning, Sgt. Smith issued Miranda warnings to the Petitioner.

We have closely reviewed the record of the hearing on the motion to suppress. The Petitioner simply has failed to establish that he was "in custody" prior to receiving his Miranda warnings such that Trial Counsel should have raised this issue in the hearing on the motion to suppress. Although the Petitioner attempts to rely on Dailey, that case is distinguishable on the facts. In Dailey, as in this case, the suspect drove himself to the police station upon an officer's request. Once there, he was taken to an interview room and interrogated. The interrogation was videotaped and, upon reviewing the tape, the Tennessee Supreme Court was able to determine the following:

> The interview took place in a small interrogation room located in a secured portion of the building. The initial phase of the interview was not prolonged. The character of the questioning was accusatory and demanding, aimed at convincing the Defendant that the police already had sufficient evidence to convict him of murdering the victim and that he had to give them an explanation. Det. Roland's and Sgt. Postiglione's tone of voice and general demeanor were conversational; however, at least one of the officers was armed. Two officers questioned him. The Defendant's movements were restrained to the extent that he was placed in the back corner of a small room with one door, the door was closed, and a police officer was sitting between the Defendant and the closed door. The interactions between the Defendant

and the officers consisted of a few prefatory comments about the Defendant's practice of homeschooling followed by increasingly focused accusations and questions about the Defendant's involvement in the victim's death. Only a few minutes into the interrogation, Det. Roland told the Defendant that if he went "strictly on the evidence, [he had] to charge [the Defendant] with first degree murder." The Defendant's initial responses ran the gamut from unequivocal denials to challenges to statements of "I don't know what to say." Eventually, after having been repeatedly told that the officers knew the Defendant was involved in the victim's death and just needed the details as to why, and that the police already had sufficient evidence to convict him of first degree murder, the Defendant confessed to killing the victim. The officers never informed the Defendant that he was free to refrain from answering questions or that he was free to end the interview until after they had extracted a confession from him.

This full recitation of the totality of the circumstances surrounding the Defendant's initial questioning convinces us that a reasonable person in the Defendant's position would have considered himself or herself "deprived of freedom of movement to a degree associated with a formal arrest," at least by the point at which Det. Roland stated, "if I go strictly on the evidence, I have to charge you with first degree murder."

Dailey, 273 S.W.3d at 103-04 (footnote omitted). The only similarities in the two cases is that the Petitioner drove himself to the police station and was questioned there by more than one officer in a room. Unlike the situation in Dailey, however, the record does not establish that, prior to being issued Miranda warnings, the Petitioner was taken to a room in a secured area of the building; that the door was closed; that the Petitioner was physically blocked from leaving the room; or that he was threatened with prosecution and told that there was already enough evidence to charge him with a serious felony. In short, the record in this case does not establish that a reasonable person in the Petitioner's position would have considered himself deprived of freedom of movement to a degree associated with a formal arrest prior to the time he was issued Miranda warnings. Accordingly, the Petitioner has failed to establish that Trial Counsel was deficient in failing to make this argument in support of the motion to suppress the Petitioner's statements. The Petitioner is not entitled to relief on this basis.

The Petitioner also asserts that Trial Counsel should have moved to suppress the evidence arising out of his visit to Potter's Lane and the bridge with law enforcement while accompanied by Goodlett, arguing that Goodlett's cooperation in this trip and reenactment provided a basis for suppression under the Sixth Amendment's right to counsel. The

Petitioner has cited us to no authority for the suppression of evidence on the basis of ineffective assistance of counsel during the gathering of said evidence. Therefore, this issue has been waived. See Tenn. Ct. Crim. App. R. 10(b).

### 3. Failure to Challenge Venue and Failure to Seek Severance of Rape Charge

As the State asserts in its brief, even assuming that Trial Counsel's performance was constitutionally deficient with regard to their failure to file a motion challenging Montgomery County as the proper venue for the homicide and rape charges and their failure to file a motion seeking severance of the rape charge from the remaining offenses charged in the indictment, the Petitioner did not prove resulting prejudice. As the post-conviction court concluded in the order denying relief, the evidence presented at trial was sufficient to establish venue in Montgomery County as to all offenses.

In denying the Petitioner's claim regarding Trial Counsel's failure to challenge venue, the post-conviction court stated:

[T]he evidence established that the [Petitioner] left the area of the victim's home around 2:00 p.m. the day the victim was last seen alive. The [Petitioner] admitted to law enforcement officers that he was the last person to see the victim alive – in Montgomery County – and that the last known location of the victim before her remains were found was the [P]etitioner's car. This evidence was sufficient for the jury to find by a preponderance of the evidence that the [Petitioner] formed his intent to kill the victim – i.e., premeditation, an element of premeditated first degree murder – in Montgomery County, even if the victim's remains were found in another county.

Regarding the charge for felony murder in perpetration of kidnapping, the evidence was sufficient for the jury to find that the [P]etitioner abducted the victim in the vicinity of her Montgomery County home and that the victim was still alive when the [P]etitioner put her in his truck [sic]. Thus, venue was proper for that felony murder count.

Regarding the charges for felony murder in perpetration of a rape and child rape, the evidence of the [P]etitioner's sexual offenses was wholly circumstantial – the victim changed into clean shorts shortly before she disappeared, semen stains were found in the victim's shorts, and the shirt the victim was wearing when her remains were discovered was turned inside out, which was consistent with being removed from her body by a human. Because the jury is permitted to draw reasonable inferences from the evidence, and

because venue may be established by circumstantial evidence, the Court finds that it was reasonable for the jury to find that venue was proper in Montgomery County[.]

Venue is a jury question, and the evidence in this case regarding venue was sufficient to present the venue question to the jury on all counts. Furthermore, the evidence produced at trial was sufficient to establish venue in Montgomery County as to all offenses, including the homicide and rape charges. Thus, counsel's decision not to assert that the offenses occurred elsewhere did not prejudice the [P]etitioner.

The evidence presented at the Petitioner's trial supports the post-conviction court's findings in this regard. Although the prosecutor took the position during closing argument that the rape occurred in Stewart County, the proof at trial was equally amenable to the conclusion that the Petitioner raped and killed the victim while they were still somewhere in Montgomery County and that he then transported her body to Stewart County for disposal. Certainly, it would have been easier to conceal a deceased child during the long drive between the scene of the abduction and the area where the victim's remains were found than to keep a live abducted child subdued so as not to attract attention.

The law on venue also supports the post-conviction court's conclusion that venue in Montgomery County as to the homicide and rape charges was established by the evidence presented at trial. As our supreme court explained in State v. Young, 196 S.W.3d 85, 101-102 (Tenn. 2006):

Our Constitution provides that an accused must be tried in the county in which the crime was committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). "Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." State v. Hutcherson, 790 S.W.2d 532, 535 (Tenn. 1990); see also Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."). Venue is a question for the jury, State v. Hamsley, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984), and may be proven by circumstantial evidence. State v. Bennett, 549 S.W.2d 949, 950 (Tenn.1977). In determining venue, the jury is entitled to draw reasonable inferences from the evidence. State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984). Importantly, where different

-70-

elements of the same offense are committed in different counties, "the offense may be prosecuted in either county." Tenn. R. Crim. P. 18(b).

Id.; see also State v. Davis, 872 S.W.2d 950, 952-53 (Tenn. Crim. App. 1993).

The Petitioner is not entitled to relief on this basis. In concluding that the Petitioner had failed to establish resulting prejudice from any deficiency on Trial Counsel's part in failing to seek severance of the rape charge from the remaining offenses charged in the indictment, the post-conviction court stated:

> The [P]etitioner does not argue that evidence regarding the rape would have been inadmissible in trials on the other counts, and vice versa; clearly the offenses with which the [P]etitioner was charged were "based on the same conduct or ar[o]se from the same criminal episode" such that joinder of the offenses would have been mandatory under Rule 8(a) of the Tennessee Rules of Criminal Procedure. The [P]etitioner argues that severance would have been necessary under Rule 14(b)(2) of the Tennessee Rules of Criminal Procedure because severance would have been "appropriate to promote a fair determination of the [Petitioner's] guilt or innocence of each offense," but the Court disagrees with the [P]etitioner's assertion. The trial court properly instructed the jury that for each offense, it could return a guilty verdict only if it found by a preponderance of the evidence that the given offenses occurred in Montgomery County. There is no evidence in the record to support that the jury was confused regarding the trial court's instructions.

We agree with the post-conviction court's conclusion on this issue and hold that the Petitioner is not entitled to relief on this basis.

### D. Trial Performance

In his fourth issue on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that Trial Counsel provided constitutionally ineffective assistance during the course of trial. Specifically, the Petitioner alleges that Trial Counsel: (1) failed to object to the trial court's statement to prospective jurors during jury selection to the effect that a finding of not guilty as to the murder counts would result in no sentencing hearing; (2) failed to object to the victim impact testimony presented by the State at sentencing as unduly prejudicial; (3) failed to object to and move for a mistrial based upon the State's tactic of posing speaking objections in the presence of the jury; (4) failed to object to and move for a mistrial based upon the State's asking leading questions of its own witnesses; (5) failed to

object to and move for a mistrial based upon the State's mischaracterization of the Petitioner's statement to law enforcement as a "confession to murder"; (6) failed to object to the State's presenting improper evidence from the nurse who drew Petitioner's blood for forensic testing prior to trial concerning the Petitioner's demeanor as being "upbeat" and "joking"; (7) conceded the Petitioner's involvement in the crimes during closing argument at sentencing; (8) failed to object with sufficient legal argument to the admissibility of the pedophilia propensity testimony presented by Dr. William Bernet; (9) failed to proffer as an exhibit during the jury-out hearing at trial the DCS records documenting that the victim's brother, Jeremy Beard, had told psychologists approximately six to twelve months after the victim's disappearance that his biological father had some years earlier "taught him to have sex with his sister"; (10) failed to utilize the DCS records pertaining to Jeremy Beard during cross-examination of the victim's mother, Jeannie Meyer, at sentencing when she attributed Jeremy's mental health problems entirely to the victim's disappearance and death; and (11) failed to object to certain irrelevant and inconclusive evidence and testimony introduced by the State at trial.

The post-conviction court denied all but one of these claims, in part, because the Petitioner failed to question attorney Converse regarding these claims and thereby present any evidence in support of these claims. The record supports the post-conviction court's findings in this regard. Converse did not testify at the post-conviction hearing about any of the specific acts or omissions identified in this issue and alleged by the Petitioner in support of his claims that Trial Counsel's trial performance amounted to ineffective assistance. We recognize that Converse was questioned generally at the hearing regarding his belief in the overwhelming guilt of the Petitioner and about Dr. William Bernet's conclusion that the Petitioner had pedophilic tendencies. However, the Petitioner never asked Converse why he conceded the Petitioner's involvement in the crimes during closing argument at sentencing and never asked Converse to elaborate on his thought process regarding the objection he made to Dr. Bernet's pedophilia propensity testimony at sentencing. In short, the Petitioner has failed to overcome the strong presumption that Trial Counsel's performance as to these matters was the result of a strategic or tactical decision and has therefore failed to establish deficient performance as to these allegations. See Gdongalay P. Berry, 2011 WL 5326280, at *8.

With regard to Trial Counsel's alleged failure to proffer the DCS records as an exhibit during the jury-out hearing at trial, the post-conviction court determined that Trial Counsel had made an offer of proof in the form of testimony from the victim's mother concerning the substance of the statements attributable to Jeremy Beard as reflected in the DCS records. As such, the post-conviction court concluded that the Petitioner could not prove prejudice to the outcome of his case resulting from the asserted deficiency in Trial Counsel's performance in not proffering the DCS records containing the same statements from Jeremy Beard.

The record supports the post-conviction court's conclusion in this regard. As the supreme court noted in its opinion in the Petitioner's direct appeal, the Petitioner proffered testimony from Jeannie Meyer during a jury-out hearing concerning the statements Jeremy Beard had made to her, which in turn she had reported to medical personnel as reflected in the DCS records. See Rogers, 188 S.W.3d at 609 n.5. Therefore, when the supreme court concluded on direct appeal that evidence from Jeremy Beard confirming that he had made the statements "would not establish that Jeremy had actually had sex with the victim versus simply reporting that he had," id. at 613, the supreme court had before it the proffer of Jeannie Meyer's testimony concerning the substance of the statements, see id. at 609 n.5, even though it declined to consider as having been improperly included in the record on appeal the DCS records which also included the statement. See id. at 611. As such, as the post-conviction court concluded, there is no reasonable probability that the outcome of the Petitioner's direct appeal would have been different had the records themselves been proffered. Accordingly, this entire issue is without merit.

*E and F.  Jury Instructions and Appellate Issues*

In his fifth and sixth issues on appeal, the Petitioner argues that the post-conviction court erred in denying his claims that Trial Counsel provided constitutionally ineffective assistance by failing to object to various jury instructions given by the trial court during the Petitioner's trial and by failing to raise various issues on appeal during the Petitioner's direct appellate proceedings. Once again, the post-conviction court denied these claims, in part, because the Petitioner failed to present any testimony in support of the claims at the post-conviction hearing. As the State argues in its brief, the record supports the post-conviction court's findings in this regard.

During his testimony at the post-conviction hearing, Converse did not address any of the specific acts or omissions the Petitioner refers to in his briefs to this Court on these issues. Indeed, Converse was asked no questions during the post-conviction hearing about any of the jury instructions given in the Petitioner's trial. With regard to the Petitioner's direct appeal, Converse testified that Brock Mehler, his co-counsel on the appeal, handled most of the work, including the drafting of the amended motion for new trial. Converse testified no further about the Petitioner's direct appeal. Mehler did not testify at the post-conviction hearing. The Tennessee Supreme Court has made clear that, when a petitioner alleges ineffective assistance of appellate counsel, factors for consideration include (1) whether appellate counsel testified at the post-conviction hearing "as to his appeal strategy and, if so, were the justifications reasonable?"; (2) whether the petitioner and appellate counsel met and discussed possible issues; (3) whether the record establishes that appellate counsel reviewed all of the relevant facts; and (4) whether appellate counsel's decision to omit an issue was "an unreasonable one which only an incompetent attorney would adopt."

-73-

Carpenter, 126 S.W.3d at 888. The Petitioner failed to adduce proof at the post-conviction hearing on these factors. Accordingly, and once again despite his arguments to the contrary, the Petitioner failed to prove any of the claims forming the basis of this issue on appeal. See Gdongalay P. Berry, 2011 WL 5326280, at *8 (rejecting claim of ineffective assistance of counsel where petitioner did not question his attorneys about the claimed deficiencies, leaving the court to speculate as to their performance). Therefore, the Petitioner is entitled to no relief on his fifth and sixth issues.

## II. Constitutional Errors at Trial and Constitutional Challenges to the Death Penalty

In his seventh, eighth, and ninth issues on appeal, the Petitioner argues that the post-conviction court erred in denying his various constitutional challenges to his trial in general and his death sentence in particular. Specifically, the Petitioner claims that: (1) Tennessee's statutorily mandated system of comparative proportionality review violates a capital defendant's right to due process of law in general and violated his right to due process of law as applied in his case; (2) his right to a fair trial was denied as a result of having only one attorney participate in individual voir dire in violation of the requirements of Rule 13, section 3 of the Rules of the Supreme Court of Tennessee; (3) his death sentence constitutes cruel and unusual punishment because it unconstitutionally impinges upon his fundamental right to life and because Tennessee's available methods of execution by lethal injection and electrocution are not consistent with the "evolving standards of decency that mark the progress of a maturing society" from which the Eighth Amendment draws its meaning, Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion); and (4) the State engaged in prosecutorial misconduct throughout the course of the trial.[8]

The post-conviction court denied all of the claims, except the claim involving the constitutional challenge to proportionality review, on grounds that they were waived for post-conviction purposes in that they were not raised on direct appeal, were not based upon constitutional rights not recognized at the time of the Petitioner's trial, and were not claims the Petitioner was prevented from raising due to state action in violation of the federal or state constitutions. We agree with this conclusion. See Tenn. Code Ann. § 40-30-106(g).

---

[8] The Petitioner also includes in this claim that Trial Counsel was ineffective in failing to object to improper remarks by the prosecution during opening statements and closing arguments. The post-conviction court determined that the prosecution did make some improper comments, to which Trial Counsel did not object. The post-conviction court concluded that Trial Counsel's performance was deficient in this regard but that the Petitioner had failed to establish prejudice. We agree with the post-conviction court's determinations in this regard.

The post-conviction court also denied the Petitioner's constitutional challenge to proportionality review on grounds that it had been raised on direct appeal and, therefore, was "previously determined." We also agree with this conclusion. See Tenn. Code Ann. § 40-30-106(h); see also Rogers, 188 S.W.3d at 631 (appx). The post-conviction court alternatively determined that the Petitioner's cruel and unusual punishment claim and his challenge to the constitutionality of proportionality review were without merit. We also agree with these conclusions as they are consistent with settled precedent. See Baze v. Rees, 553 U.S. 35 (2008); Workman v. Bredesen, 486 F.3d 896, 905-09 (6th Cir. 2007); State v. Kiser, 284 S.W.3d 227, 294 (Tenn. 2009) (appx); Abdur'Rahman v. Bredesen, 181 S.W.3d 292, 306-09 (Tenn. 2005).

### III. Cumulative Error

In his tenth issue on appeal, the Petitioner contends that he is entitled to relief from his convictions and sentences due to cumulative error. However, there is no record citation contained within the argument for this issue indicating that the Petitioner raised a cumulative error claim below. See Tenn. R. App. P. 27(a)(7)(A) (requiring argument to contain "citations to the authorities *and* appropriate references to the record") (emphasis added). As such, even though the State does not argue waiver in response to this issue, we have concluded that the issue is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, *or appropriate references to the record* will be treated as waived in this court." ) (Emphasis added); see also State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). Even if this Court chose to address the merits of the cumulative error claim, this Court would conclude that this issue is without merit.

### Conclusion

For the foregoing reasons, the judgment of the post-conviction court denying the Petitioner's initial and amended petitions for post-conviction relief challenging his convictions and sentences arising out of the disappearance and murder of nine-year-old Jacqueline Beard is affirmed.

_____
JEFFREY S. BIVINS, JUDGE